31 F.3d 924
 RICO Bus.Disp.Guide 8618
 PILLSBURY, MADISON & SUTRO, a California corporation,
Plaintiff-Appellant,
v.
Abraham Avi LERNER; Jonathan Beare; Christopher Ellis;
Michael Katz; Richard Bergman; Baxter Ellis Inc.;
Fifty-Fivecal Corp.; 114 Sansome Associates, Ltd.;
Nathanna Financial Corp.; Vertovest Properties, Inc.; Alan
Lawrence Lee; Maurice Debbah; Princeton Investments
PLC; Princeton Sansome Corp.; 114 Sansome Street Ltd.
Partnership; Princeton San Fran, Inc.; Zapala N.V. c/o
Curacao Corp. Co. N.V.; Jones Lang Wootton USA; Jones Lang
Wootton US Inc., Defendants-Appellees.
 No. 92-16596.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 10, 1994.
Decided Aug. 15, 1994.
 
 John J. Bartko, Bartko, Welsh, Tarrant & Miller, San Francisco, CA, for plaintiff-appellant.
 Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, Roger B. Mead, Folger & Levin, San Francisco, CA; Mark D. Plevin, Crowell & Moring, Washington, DC; Jeffrey T. Golenbock, Golenbock, Eiseman, Assor & Bell, New York City, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before: POOLE, BEEZER, and T.G. NELSON, Circuit Judges.
 T.G. NELSON, Circuit Judge:
 
 
 1
 This appeal arises out of various transactions involving the Adam Grant building, 114 Sansome Street, San Francisco, where appellant, the law firm of Pillsbury, Madison & Sutro (Pillsbury), rents office space, and the effect of those transactions on the amount of rent to be paid by Pillsbury. Pillsbury appeals the district court's Fed.R.Civ.P. 12(b)(6) dismissal for failure to state a claim of its action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-1968, against the past and present owners of the building and the real estate broker. Pillsbury alleges that as part of an international money laundering and fraud enterprise, defendants engaged in a fraudulent transfer of 114 Sansome Street in order to inflate the property's ostensible value and inflate Pillsbury's rent. The district court's order dismissing Pillsbury's case was based on the failure to meet the proximate cause requirement imposed for civil RICO actions. See Holmes v. Securities Investor Protection Corp., --- U.S. ----, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1311-12 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). We affirm.
 
 BACKGROUND AND PROCEEDINGS
 
 2
 Pillsbury is the major tenant in the Adam Grant Building, occupying about fifty percent of the building's office space. Pillsbury subleases the space from Sansome Realty Corporation (SRC), the master tenant of the property. SRC leases the building pursuant to a thirty-year lease originally entered into in 1970. The annual rent was originally set at $270,000 for ten years. The lease provided that after the initial ten-year period, the rent would be adjusted for two successive ten-year terms, either by agreement of the parties or by arbitration before three real estate appraisers. When the renewal issue first arose in 1980, the parties could not agree on the revised rent, so the matter was arbitrated. The annual rent for 1980 to 1990 was increased approximately three-fold to $780,000.
 
 
 3
 In 1989 the Grant Company decided to sell the building, and listed it at $18,750,000. A limited partnership (the "new owner" or "seller defendants") purchased the building for approximately $17.5 million. The new owner and SRC could not agree upon a revised rent for the second ten-year term, so the issue was referred to arbitration. The new owner contacted real estate broker Timothy Mason (a managing director of defendant Jones Lang Wootton) to serve as a potential expert witness in the arbitration. Mason, who later suggested he might have a buyer for the building, in fact negotiated a resale of the building to a partnership (the Princeton defendants) for $32 million.
 
 
 4
 The Princeton defendants took over the rent arbitration with SRC. After eleven days of hearings, the appraisers unanimously ruled that the fair annual rental was $2.4 million. SRC challenged the arbitrators' decision in San Francisco Superior Court and thereafter in the California Court of Appeal, alleging irregularities in the proceedings. These challenges were unsuccessful and the decision is now final.
 
 
 5
 Following the arbitration, SRC notified Pillsbury that under the sublease, Pillsbury was obligated to pay $1,035,000 out of an approximate $1.6 million increase in the total annual master lease rent. Pillsbury refused to pay, and entered into a "standstill agreement" with SRC which provides that the parties agree to forbear commencing litigation to enforce the pass-through provision of the sublease, and that Pillsbury has conditionally agreed to pay a significant portion of the rent increase.
 
 
 6
 Pillsbury then brought suit against the seller defendants, the Princeton defendants and Jones Lang Wootton defendants, alleging RICO violations and several related state tort law claims. The district court dismissed Pillsbury's original complaint with leave to amend on the ground that the RICO allegations were insufficient. Pillsbury then filed a 100-page first amended complaint. Pillsbury alleged the defendants were parties to wide-ranging money laundering and mail fraud schemes designed and implemented by Michael Milken and his associates to hide illicit proceeds of junk bond manipulations. Milken is not named as a party, but the complaint purports to place him at the center of the alleged conspiracy. As part of this alleged scheme, Pillsbury contends that the defendants used sham sales of 114 Sansome Street to inflate the value of the building and to raise rents.
 
 
 7
 The court granted the defendants' motion to dismiss the first amended complaint on the ground that Pillsbury failed to allege that it was proximately injured by the alleged RICO violations. In so ruling, the district court explained that Holmes, --- U.S. ----, 112 S.Ct. 1311, 117 L.Ed.2d 532, decided eleven days after Pillsbury filed its first amended complaint, "establishes the lack of standing" of Pillsbury, because Pillsbury "cannot meet the proximate cause requirement that the Supreme Court has now imposed for RICO civil actions." In explaining why Pillsbury is "not the party who has a RICO cause of action under the Holmes analysis," the court noted Pillsbury's status as a subtenant and the "filter of the arbitration proceeding." The court dismissed the state law claims for lack of jurisdiction.[1] Pillsbury timely appeals.
 
 STANDARD OF REVIEW
 
 8
 Dismissal of a complaint under Fed.R.Civ.P. 12(b)(6) is reviewed de novo. Imagineering, 976 F.2d at 1306. All allegations of material fact in the complaint are taken as true and are construed in the light most favorable to Pillsbury. Id. "Nonetheless, conclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim." McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir.1988). A dismissal for failure to state a claim is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Chandler v. McMinnville School Dist., 978 F.2d 524, 527 (9th Cir.1992) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). This court may affirm on any ground finding support in the record. Imagineering, 976 F.2d at 1306.
 
 DISCUSSION
 
 9
 To maintain a cause of action under RICO, a plaintiff must show not only that the defendant's violation was a "but for" cause of his injury, but that it was the proximate cause as well. Holmes, --- U.S. at ---- - ----, 112 S.Ct. at 1317-18. "This requires that there must be a direct relationship between the injury asserted and the injurious conduct alleged." Imagineering, 976 F.2d at 1311 (citing Holmes, --- U.S. at ----, 112 S.Ct. at 1318). The Court focused on the directness of the relationship for three reasons. "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." Holmes, --- U.S. at ----, 112 S.Ct. at 1318. Second, courts would have to adopt complicated apportionment rules to avoid multiple recoveries. Id. Third, directly injured victims can generally be counted on to sue, "without any of the problems attendant upon suits by plaintiffs injured more remotely." Id. (citing Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 541-42, 103 S.Ct. 897, 910-11, 74 L.Ed.2d 723 (1983)). These three policy concerns guide a court's evaluation of the directness of the injury. Id. --- U.S. at ----, 112 S.Ct. at 1321 n. 20.
 
 
 10
 The reasoning of Holmes was applied by this court in Imagineering, 976 F.2d 1303, which was decided after the district court ruled in the instant case. In Imagineering, a class of minority and woman-owned business enterprises (MWBEs) brought a RICO case against prime contractors which had allegedly engaged in a scheme to procure government contracts for public works construction by circumventing government regulations requiring the use of MWBEs. The plaintiff MWBEs sued to recover the lost profits which they allegedly would have earned on these projects in the absence of the defendants' scheme. Id. at 1306. We found the plaintiffs did not adequately allege RICO proximate causation, explaining:
 
 
 11
 Assuming the bad conduct by [defendant] deprived the named prime contractors of specified projects, and that in turn foreseeably deprived the MWBE plaintiffs of the subcontracts, "but for" causation appears present. It is much more difficult, however, to take the next step and determine that there exists a direct relationship between [defendant's] conduit scheme and the plaintiffs' failure to earn certain profits on the subcontracts. The direct harm in this case runs to the prime contractors. It was the intervening inability of the prime contractors to secure the contracts that was the direct cause of plaintiffs' injuries. Under Holmes, the MWBE plaintiffs are missing the direct relationship needed to show [defendant] proximately caused their injuries.
 
 
 12
 Id. at 1312.
 
 
 13
 Similarly, in this case the direct harm runs to SRC, the master tenant, which is responsible for the payment of the rent whether or not it collects any of the increase from the sublessees, and which was a party to the allegedly tainted arbitration proceeding. Pillsbury is not directly injured by the alleged sham sales of the building and the arbitration. It is SRC's attempt to pass on a portion of the rent increase, in accordance with a sublease negotiated between SRC and Pillsbury, that connects the defendants' acts to the loss suffered by Pillsbury. As in Holmes and Imagineering, the necessary direct relationship between the plaintiff and the defendant is missing in this case. See Holmes, --- U.S. at ----, 112 S.Ct. at 1319; Imagineering, 976 F.2d at 1312. This conclusion is bolstered by the fact that Pillsbury's loss depends on the intervening arbitration proceeding, in which SRC vigorously opposed the rent increase throughout the eleven-day hearing. "[A] plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." Holmes, --- U.S. at ----, 112 S.Ct. at 1318.
 
 
 14
 We also found in Imagineering that the plaintiffs failed to allege a sufficiently concrete financial loss. 976 F.2d at 1310-11; see also Oscar v. University Students Coop. Ass'n, 965 F.2d 783, 785 (9th Cir.) (en banc) (a showing of civil RICO injury requires proof of concrete financial loss), cert. denied, --- U.S. ----, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992). This is not an issue here. The district court correctly observed in this case that the failure to meet the proximate cause requirement was a failure to establish standing. See Holmes, --- U.S. at ----, ----, ----, ----, 112 S.Ct. at 1317, 1319, 1321, 1322. Assuming Pillsbury alleged a concrete financial loss in this case, the failure to adequately demonstrate that such loss resulted directly from the wrongful conduct of the defendants means its loss is too remote to be actionable under RICO. Id.; see also Imagineering, 976 F.2d at 1311-12.
 
 
 15
 Pillsbury's citation to Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., 985 F.2d 102 (2d Cir.1993), a case which is not binding on this court, does not assist its claim. Standardbred focused in part on whether the injury to the plaintiffs was reasonably foreseeable. Id. at 104. This approach does not comport with Imagineering. See Imagineering, 976 F.2d at 1312 (court assumed foreseeability and "but for" causation, but still held no direct relationship alleged to show proximate cause). Furthermore, under the facts in Standardbred, the Second Circuit was able to state that the plaintiffs were "not making a claim that is derivative of injury, if any, sustained by [a third party (who provided financing to the defendants) ]." 985 F.2d at 104. The same cannot be said here.
 
 
 16
 Pillsbury's contention that its allegations of defendants' specific intent to cause harm to it somehow preserves its standing in this case is incorrect. The existence of specific intent does not answer the question of whether the injury is specifically direct. R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139 (9th Cir.1989) (en banc), relied upon by Pillsbury, describes specific intent of the alleged conspirators and the directness of the injury as two separate factors to be considered in evaluating antitrust standing. Id. at 146. "An allegation of intentional injury is not 'a panacea that will enable any complaint to withstand a motion to dismiss.' " Id. (quoting Associated Gen. Contractors, 459 U.S. at 537, 103 S.Ct. at 908). Certainly, nothing in Holmes suggests that allegations of specific intent to cause RICO harm override the necessity to evaluate the directness of injury in a case like this.
 
 
 17
 In this case, as in Imagineering, the Holmes policy concerns underlying the direct relationship requirement are implicated. Analysis of these policy concerns demonstrates that, contrary to Pillsbury's contention, the district court did not impose an improper black letter rule determinative of proximate cause. Cf. Holmes, --- U.S. at ---- n. 20, 112 S.Ct. at 1321 n. 20 (" 'the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case' " (quoting Associated Gen. Contractors, 459 U.S. at 536, 103 S.Ct. at 907-08)).
 
 
 18
 Pillsbury argues that there are no difficulties in ascertaining its damages attributable to the RICO violation in this case because the sublease is, in effect, a damages calculating mechanism and the precise amount of the injury visited on Pillsbury is the amount of rent increase set by the sublease. Pillsbury argues that SRC, the master tenant, was simply a conduit through which the injury passed, providing no independent effect on damages. Pillsbury also argues that its loss was not contingent upon a loss suffered by SRC because insofar as the property subject to Pillsbury's sublease is concerned, the master tenant suffered no loss because of the pass-through provision of the sublease.
 
 
 19
 The district court's observation on this issue was "[t]hat may be true. It may not be true." Pillsbury's complaint is not clear on the operation of the pass-through provisions of the sublease. In fact, the complaint demonstrates there is nothing "automatic" about the sublease rent increase. Pillsbury alleges in its complaint that SRC is not currently passing along the full amount of Pillsbury's "percentage share" of the master lease rent increase; that the parties have a dispute about their obligations; and that they may end up litigating how much, if any, of the rent increase can be passed through.
 
 
 20
 In addition, the arbitration proceeding and SRC's subsequent invocation of the alleged pass-through clause are precisely the kind of independent factors the Supreme Court recognized would make it difficult to determine how much, if any, of the claimed violations are attributable to the alleged RICO violation. Even assuming the sublease determines the precise amount of the master lease rent that SRC can pass through to Pillsbury, the district court would be forced to determine whether and how much of the annual master lease rent increase imposed by the 1990 arbitration was due to reliance on the alleged phony resale of the building, and how much was due to other independent factors, such as general increases in the relevant rental market.[2] "The general tendency of the law, in regard to damages at least, is not to go beyond the first step." Holmes, --- U.S. at ----, 112 S.Ct. at 1319 (internal quotations omitted); see also Imagineering, 976 F.2d at 1312. We decline Pillsbury's invitation to go beyond the first step.
 
 
 21
 For similar reasons, we reject Pillsbury's argument that the risk of multiple recoveries is not implicated in this case because the amount of injury suffered by it is precisely ascertainable from its written sublease. Even assuming the amount of Pillsbury's injury is simple to ascertain, permitting Pillsbury to sue needlessly exposes the defendants to a risk of multiple recoveries by SRC, Pillsbury, and SRC's other subtenants. The seller defendants also point out that unless SRC was made a party to the case, there would be the further problem that any judgment rendered in this suit would not be binding in litigation over the same claims between SRC and the defendants. This potential for multiple recoveries highlights the indirect nature of Pillsbury's injury. See Holmes, --- U.S. at ----, 112 S.Ct. at 1320; Imagineering, 976 F.2d at 1312. As discussed below, the apportionment task need not be taken on when recovery by the directly injured party (SRC) would handle this problem automatically.
 
 
 22
 Pillsbury argues that as a practical matter, it is the only party whose injury is great enough to outweigh the transactional costs associated with this lawsuit, and that because of the pass-through provision of the sublease, SRC's economic incentive to oppose the rent increase is diluted. Neither of these contentions converts Pillsbury into a directly injured party in this case. Pillsbury has no relationship with the defendants, and its alleged injury results from SRC's attempt to enforce the terms of the sublease following the arbitration award setting the master rent.
 
 
 23
 Pillsbury is not the only potential plaintiff with an incentive to sue based on the alleged wrongs. The directly injured party, SRC, can sue for the whole injury and seek treble damages based on the full master rent increase. Furthermore, because of the standstill agreement with Pillsbury, SRC is currently shouldering a significant portion of the rent increase. At a minimum, SRC could sue to recover treble damages for the rent increase that is not subject to the Pillsbury pass-through, as well as attorney fees.
 
 
 24
 Holmes points out that directly injured victims can generally be counted on to vindicate the law as private attorneys general; it does not say that the directly injured party must sue. See --- U.S. at ----, 112 S.Ct. at 1318. The fact that SRC has not pursued a RICO case is not dispositive. See id.; cf. Associated Gen. Contractors, 459 U.S. at 542 n. 47, 103 S.Ct. at 911 n. 47 ("Indeed, if there is substance to the Union's claim, it is difficult to understand why these direct victims of the conspiracy have not asserted any claim in their own right.") We need not speculate on the reasons why SRC has not sued the defendants.
 
 
 25
 "[I]t is well-established that not all injuries are compensable under [RICO]." Oscar, 965 F.2d at 785. The district court's proximate cause inquiry in this case was properly guided by the concerns set out in Holmes, and was not an invocation of a black letter rule requiring a finding of indirect injury. National Org. for Women, Inc. v. Scheidler, --- U.S. ----, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), in which the plaintiffs alleged RICO injury which was "fairly traceable to the defendant's allegedly unlawful conduct," id. at ----, 114 S.Ct. at 803, did not involve problems with the proximate causation standard, and does not assist Pillsbury's argument.
 
 
 26
 In view of our determination concerning proximate cause, we need not address Pillsbury's other arguments. We have considered all of the arguments advanced by the parties and conclude that no further discussion is necessary.
 
 CONCLUSION
 
 27
 The district court's dismissal of Pillsbury's complaint pursuant to Fed.R.Civ.P. 12(b)(6) is affirmed.
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 Pillsbury subsequently filed suit against the defendants in state court alleging intentional interference with contract, fraud, and constructive trust. The Superior Court sustained the defendants' demurrers without leave to amend for failure to state a cause of action. In an unpublished decision, the California Court of Appeal affirmed the judgment of dismissal. The California Supreme Court denied Pillsbury's petition for review on June 1, 1994
 
 
 [2]
 The defendants note that, like the initial rent increase in 1980, the 1990 increase was approximately three-fold