**Akhtar HAMID, on Behalf of Himself and all Others Similarly Situated, Plaintiffs–Appellants,**

v.

**PRICE WATERHOUSE, Price Waterhouse/U.K.; Price Waterhouse World Firm Ltd.; Price Waterhouse/U.S.; Ernst & Young; Abu Dhabi, Emirate of Abu Dhabi; Abu Dhabi Investment Authority; Bank of America Corporation, Bankamerica Corp.; Bank of America NT & SA; Hill & Knowlton; Concorde Finance & Investments, GRP Investments; Interredec, Inc.; Interredec Southern Co.; et al.; First American Corp., First American Bankshares; Paul Adams; Jack Beddow; A. Vincent Scoffone; T. Bertram Lance; Independence Bank; Manuel Noriega; Fulvio Dobrich; Robert Altman; Clark Clifford; Clifford & Warnke, Defendants–Appellees.**

**Akhtar HAMID, on Behalf of Himself and all Others Similarly Situated, Plaintiffs–Appellees,**

v.

**PRICE WATERHOUSE, Price Waterhouse/U.K.; Price Waterhouse World Firm Ltd.; Price Waterhouse/U.S.; Ernst & Young; Abu Dhabi, Emirate of Abu Dhabi; Abu Dhabi Investment Authority; Bank of America Corporation, Bankamerica Corp.; Bank of America NT & SA; Hill & Knowlton; Concorde Finance & Investments, GRP Invest-**

ments; Interredec, Inc.; Interredec Southern Co.; et al.; T. Bertram Lance; Independence Bank; Manuel Noriega; Fulvio Dobrich; Robert Altman; Clark Clifford; Clifford & Warnke, Defendants,

and

First American Corp., First American Bankshares, Inc.; Paul G. Adams; Jack Beddow; A. Vincent Scoffone; Defendants–Appellants.

Akhtar HAMID, on Behalf of Himself and all Others Similarly Situated, Plaintiffs–Appellees,

v.

PRICE WATERHOUSE, Price Waterhouse/U.K.; Price Waterhouse World Firm Ltd.; Price Waterhouse/U.S.; Ernst & Young; Abu Dhabi, Emirate of Abu Dhabi; Abu Dhabi Investment Authority; Bank of America Corporation, Bankamerica Corp.; Bank of America NT & SA; Hill & Knowlton; T. Bertram Lance; Independence Bank; Manuel Noriega; Robert Altman; Clark Clifford; Clifford & Warnke, First American Bankshares, Inc.; Jack W. Beddow; Paul G. Adams; A. Vincent Scoffone, Defendants,

and

Concorde Finance & Investments; Interredec, Inc.; Interredec Southern Company, Inc.; Wesley Company, Inc.; River Oaks, Inc.; River Oaks Investments, Inc.; Sterling Bluff, Inc.; GRP Investments N.V., Defendants–Appellants.

Nos. 92–56085, 92–56198 and 92–56199.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 31, 1994.

Decided April 7, 1995.

William S. Lerach (argued), and Kevin P. Roddy (on the briefs), Milberg, Weiss, Bershad, Spechthrie & Lerach, San Diego, CA, for plaintiffs-appellants Hamid.

Stephen J. Brogan (argued), and Elwood G. Lui (on the briefs), Jones, Day, Reavis & Pogue, Washington, DC, for the defendants-appellants First American Corp., First American Bankshares, Inc., Jack W. Beddow, Paul G. Adams, III, and A. Vincent Scoffone.

James W. Colbert, III, O'Melveny & Myers, Los Angeles, CA (argued), for all defendants-appellees.

Robert C. Vanderet and Linda J. Smith, O'Melveny & Myers, Los Angeles, CA,

James E. Tolan and William K. Dodds, Dechert, Price & Rhoads, New York City, for defendant-appellee Price Waterhouse United Kingdom.

DeBevoise & Plimpton, John G. Koeltl, Bruce G. Merritt, Edwin G. Schallert, Barton Legum, New York City, for Price Waterhouse of the United States.

Gravath Swaine & Moore, Francis P. Barron, New York City and Munger Tolles & Olson, Alan D. Bersin, Michael R. Doyen, Los Angeles, CA, for Price Waterhouse World Firm Ltd.

Patton, Boggs & Blow, Ronald S. Liebman, Scott N. Stone, Charles E. Talisman, Washington, DC and Kendig & Ross, Dennis A. Kendig, Bradley D. Ross, Los Angeles, CA, for Emirate of Abu Dhabi and Abu Dhabi Inv. Authority.

Jones Day Reavis & Pogue, Stephen J. Brogan, Elwood G. Lui, Washington, DC, for First American Corp., First American Bankshares, Inc., Jack W. Beddow, Paul G. Adams, III, and A. Vincent Scoffone.

Davis & Gilbert, Mitchell I. Weitz, Howard J. Rubin, New York City and Irell & Manella, Morgan Chu, Wayne Barsky, Los Angeles, CA, for Hill & Knowlton.

John C. Fauvre, Ullar Vitsut, Los Angeles, CA, James Roethe, Office of the Gen. Counsel, Bank of America, Michael J. Halloran, Gen. Counsel, San Francisco, CA, for Bank of America, NT & SA and BankAmerica Corp.

Richards, Watson & Gershon, John A. Belcher, Los Angeles, CA, for Fulvio Dobrich.

Johnson & Gibbs, K. Chris Todd, Mark C. Hansen, Washington, DC, and O'Neill & Lysaght, Brian O'Neill, Santa Monica, CA, for Concorde Finance & Investments, GRP Investments, N.V., InterRedec, Inc., InterRedec Southern Co., Inc., Wesley Co., Inc., River Oaks, Inc., River Oaks Investments, Inc. and Sterling Bluff, Inc.

Rosenfeld, Meyer & Susman, Gary D. Schlessinger, James L. Seal, Beverly Hills, CA, for Clark Clifford, Robert Altman and Clifford & Warnke.

Heller, Ehrman, White & McAuliffe, M. Laurence Popofsky, Ronald C. Peterson, San

Francisco, CA, and Bruce M. Cormier, Kathryn A. Oberly, Office of the Gen. Counsel, Ernst & Young, Washington, DC, for Ernst & Young.

Mark C. Hansen, Johnson & Gibbs, Washington, DC, for defendants-appellees Concorde Finance.

Before BROWNING, BOOCHEVER and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This is an appeal from dismissal of a class action by depositors in the Bank of Credit & Commerce International ("BCCI"). The issues we resolve involve timeliness of appeal, judicial recusal, the derivative nature of the depositors' RICO claims, and the application of the Alien Tort Statute.

We have jurisdiction over depositors' claims pursuant to 28 U.S.C. § 1291. We review the district court's dismissal for failure to state a claim *de novo*. *Oscar v. University Students Co–Operative Ass'n,* 965 F.2d 783, 785 (9th Cir.1992) (en banc). A district court's refusal to disqualify the sitting judge may be reversed only for an abuse of discretion. *Thomassen v. United States,* 835 F.2d 727, 732 (9th Cir.1987).

### I. Facts

This case was dismissed for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6). We therefore are bound to evaluate whether the complaint states causes of action on the assumption that appellants could prove the averments. *Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924, 928 (9th Cir. 1994).

Appellants claim to represent depositors of funds in what they call "the constellation of banks known as Bank of Credit & Commerce International ("BCCI")." They do not sue the "constellation of banks." They sue seventy-seven people, firms, and a foreign country.

The complaint alleges that the seventy-seven defendants illegally acquired various banks in the United States, caused deposits to be misused and misappropriated, and, by misrepresenting facts about BCCI, delayed the day when regulators would shut it down. By making the bank appear to be in better financial condition than it really was, some defendants are alleged to have enabled it to attract deposits which it otherwise would have been unable to obtain. Most of the complaint consists of elaborating the egregiousness of the misuse and misappropriation of funds, including allegations of financing international terrorism, narcotics, and arms dealing, and using bribery and fraud to keep governments from interfering with BCCI's and the defendants' activities, along with extensive polemical elaborations such as pointing out that the "BCCI pirates" were "men in business suits." The looting which allegedly caused the bank to be unable to pay the depositors included loans to insiders which were intended never to be repaid.

The district court dismissed depositors' RICO claims without leave to amend after they filed their third amended complaint. Appellants' arguments go to whether their claims were such that relief could be granted, not whether they could have stated valid claims had they been given another chance to amend.

Facts dealing with particular issues are explicated more fully below, in the discussions of the issues.

### II. Analysis

A. *Appellate Jurisdiction*

We must first decide whether the appeal was untimely, depriving us of jurisdiction. The complaint went through four iterations. The district court dismissed the third amended complaint on April 30, 1992. On May 11, the plaintiffs moved to recuse Judge Marshall, on the ground that the employment plans of her law clerks required her to be disqualified. They also filed a motion under Federal Rule of Civil Procedure 52(b) to vacate the April 30 judgment on the basis of Judge Marshall's alleged disqualification. They did not appeal at that time.

Judge Marshall issued a corrected version of her order and judgment May 20. Judge Byrne denied the motion to recuse Judge Marshall July 9. Judge Marshall then denied the Rule 52(b) motion July 27. Plaintiffs filed their notice of appeal August 19. The appeal is directed to the merits of the dismissal, not just to whether Judge Marshall should have been recused. The appellate jurisdiction issue is whether the appeal was timely as to the merits. On its face, an August 19 appeal from a May 20 judgment comes more than thirty days after the judgment. *See* Fed.R.App.P. 4(a)(1).

Appellees argue that the motion to vacate the judgment could not properly be characterized as a Rule 52(b) motion, that it should not be characterized as a Rule 59 motion which would toll the running of the thirty days, and that as a Rule 60(b) motion, it would not toll the thirty days. They are correct about Rule 52(b). That rule governs motions to amend findings of fact. This case was dismissed before trial; the district court did not hear evidence or make findings. Nor was the motion directed toward correction of any findings. It related solely to recusal because of the law clerks' conflicts of interest.

■ Appellees are also correct that at the time the notice of appeal was filed, a Rule 60(b) motion was not among those which would toll the thirty days for filing notice of appeal. Fed.R.App.P. 4(a)(4).[1] We are nevertheless satisfied that appellants' motion, denominated incorrectly as a Rule 52(b) motion, should properly be deemed a Rule 59(e)

motion. If a timely Rule 59 motion is filed, the thirty days for appeal does not begin to run until entry of the order on that motion. Fed.R.App.P. 4(a)(4).

The motion to vacate on the ground that the judge should have recused herself appears on its face to be no more of a Rule 59 than a Rule 52(b) motion, for the same reasons. Nevertheless, our precedents require that we treat a motion to vacate an order of dismissal as a Rule 59(e) motion. *Mir v. Fosburg*, 646 F.2d 342, 344 (9th Cir.1980). Our precedents also require that we treat a motion which could have been made as a timely Rule 59 motion as though it were so made. *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1419 (9th Cir. 1984). This liberality has the practical effect of letting appeal wait until the timely post-trial motion has been decided. The 1993 amendments to Federal Rule of Appellate Procedure 4(a)(4) will no doubt obviate this confusion.[2]

The appeal was timely as to the merits, not just as to recusal, so we have jurisdiction.

### B. *Recusal*

The appellants claimed below, and argue here, that Judge Marshall should have recused herself from the case because of her law clerks' employment plans. The motion to recuse Judge Marshall and vacate the judgment on this ground was denied by a different district judge, Judge Byrne. We review the district court's denial of the recusal motion for abuse of discretion, *Thomas-*

---

1. The notice of appeal was filed August 19, 1992. The amendment at Fed.R.App.P. 4(a)(4)(F), which provides that the time for appeal runs from the entry of the order disposing of a motion for relief under Rule 60, was not yet in effect. Because we conclude that appeal was timely under the rules in effect in 1992, we do not have occasion to decide whether the 1993 amendment would affect pending appeals filed prior to the date of the amendment.

2. Fed.R.App.P. 4(a)(4), as amended effective December 1, 1993, provides as follows:

   (4) If any party makes a timely motion of a type specified immediately below, the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding. This provision applies to a

   timely motion under the Federal Rule of Civil Procedure:

   (B) to amend or make additional findings of fact under Rule 52(b), whether or not granting the motion would alter the judgment;
   (C) to alter or amend the judgment under Rule 59;

   (F) for relief under Rule 60 if the motion is served within 10 days after entry of judgment....

   The amendment changed the wording, changed the numbering of the subsections, and added the reference to Rule 60. Under the rule previously in effect, reference was made to motions under Rules 50(b), 52(b), and 59, but not 60.

*sen v. United States,* 835 F.2d 727, 732 (9th Cir.1987), and find none.

A federal judge must disqualify herself from any proceeding in which her impartiality might reasonably be questioned. 28 U.S.C. § 455(a). The test for recusal in this circuit is " 'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.' " *Milgard Tempering, Inc. v. Selas Corp. of Am.,* 902 F.2d 703, 714 (9th Cir.1990) (quoting *Herrington v. Sonoma Cty.,* 834 F.2d 1488, 1503 (9th Cir.1987)). Depending on how an individual judge manages her chambers, a law clerk's role in her decisionmaking may be quite significant. Even if the judge has no reason to recuse herself based upon her own circumstances, a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned.

However, "[i]f a clerk has a possible conflict of interest it is the clerk, not the judge, who must be disqualified.... [A] law clerk's acceptance of future employment with a law firm would [not] cause a reasonable person to doubt the judge's impartiality so long as the clerk refrains from participating in cases involving the firm in question." *Hunt v. American Bank & Trust Co.,* 783 F.2d 1011, 1016 (11th Cir.1986), *quoted in Milgard,* 902 F.2d at 714.

■ Two of Judge Marshall's law clerks' employment relationships are at issue, and they are different. Clerk One served as Judge Marshall's law clerk during the earliest stages of the case at bar, and he subsequently became an associate at Debevoise & Plimpton ("the Debevoise firm"). The Debevoise firm represents one of the named defendants, Price Waterhouse/United States. Clerk One filed a sworn declaration stating that he did no work at all on the case at bar while he clerked for Judge Marshall. He says he read the complaint (a public document) on his last day clerking and put it in Judge Marshall's file, but did not ever discuss the case with the judge or have any other involvement with the case during his clerkship. At the time he left his clerkship, Clerk One did not know that the Debevoise firm would subsequently appear for a defendant.

Clerk One had no involvement in the case at bar which would give rise to a disqualification of Judge Marshall. A reasonable person knowing all the facts regarding Clerk One's relationship with the Debevoise firm and his lack of involvement in the case at bar would not conclude that the impartiality of Judge Marshall's decisions in the case should be questioned. The rule laid down in *Hunt* and *Milgard* would prevent recusal on account of Clerk One's relationship with the Debevoise firm because Clerk One did not work on the case at bar. His advice to and research for Judge Marshall could not be tainted if he gave no advice and did no research.

■ Judge Marshall's other law clerk, Clerk Two, did extensive work on the case. The question regarding Clerk Two is whether he had a disqualifying relationship with a law firm such that Judge Marshall should have taken him off the case. Mr. Lerach, plaintiffs' counsel, filed a declaration asserting that he had learned that (1) Clerk Two was on a "leave of absence" from Skadden, Arps, Slate, Meagher & Flom ("the Skadden firm") during his clerkship with Judge Marshall, (2) the Skadden firm represented Clark Clifford and Robert Altman, defendants in the case at bar, in a criminal case arising out of their involvement with BCCI, and had accepted service of process for them in the case at bar; and (3) Clerk Two "was scheduled" to return to the Skadden firm when he finished his clerkship, but "at the last moment" instead went to work at a different law firm "in the same building as Skadden, Arps and on a contiguous floor."

No reasonable person would suspect that a law clerk was slanting his advice to a judge in favor of a law firm because the clerk subsequently went to work for a different law firm "in the same building ... on a contiguous floor." It is to filter out fantastic suggestions like this that the word "reasonable" is part of the recusal test.

However, a reasonable person might be concerned whether a law clerk's advice to a judge would be biased in favor of the position taken by a firm, if the law clerk had worked

there before his clerkship, was on a leave of absence, and planned to work there after his clerkship. *Cf. Hunt,* 783 F.2d at 1015. Clerk Two, however, filed a declaration stating that this was not what had happened. He asserted that he had "terminated" his employment at the Skadden firm prior to his clerkship, and although the firm had made him an offer, he had not resumed employment with the firm and had accepted an offer from a different firm. He also said that during the time he worked on the case at bar for Judge Marshall, he "was unaware" that the Skadden firm represented any clients in matters relating to BCCI, the firm did not appear for anyone in the case, and he had not communicated with anyone in the firm about the case. The Skadden firm in fact has not appeared for any party in the case at bar.

Judge Byrne accepted the truth of Clerk Two's representation that he did not know the Skadden firm had a role of any kind relating in any way to the BCCI case. We conclude that Judge Byrne did not abuse his discretion in deciding that Clerk Two's prior association with the Skadden firm required neither his removal from the case nor Judge Marshall's recusal because of his failure to remove himself.

Because of the very large number of defendants and law firms involved in this case, the likelihood that a law clerk would have some sort of connection to one of them is higher than in most cases, and the likelihood that that connection would matter is lower. A reasonable observer would more likely see any relationship "as implicit in the special circumstances [of the complexity of the case and large number of parties and law firms involved] rather than as an odd coincidence the failure to avoid which might suggest bias." *In re Allied–Signal, Inc.,* 891 F.2d 967, 971–72 (1st Cir.1989). The question of bias is one of whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. It is not a question of whether a line can be drawn connecting a person within chambers to a person or firm related, no matter how remotely, to a party in the case.

We need not determine whether a different conclusion could be reached on the facts. It is enough that Judge Byrne did not abuse his discretion in deciding that Judge Marshall need not have recused herself on account of her law clerks' professional relationships with the two law firms.

## C. *Law of Nations*

The complaint alleges that the seventy-seven defendants committed "torts in violation of the laws of nations and treaties of the United States." It does not specify which treaties, and the appellate briefs apparently do not dispute the correctness of the district court's dismissal of any claims based on violations of treaties. The complaint alleges the defendants violated the law of nations by causing the bank to loan money to criminals and to insiders and bribing or lying to bank regulators.

Because many of the members of the purported class are aliens, appellants argue the district court had jurisdiction to decide this claim under the Alien Tort Statute, 28 U.S.C. § 1350. The Alien Tort statute provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* The district court dismissed this cause of action without leave to amend because the depositors did not allege official action or a violation of the law of nations.

The Alien Tort Statute has· seldom been invoked, so precedent is sparse for the definition of "law of nations." Analyzing the scope of the Alien Tort Statute, the Second Circuit noted that "although it has been with us since the first Judiciary Act ... no one seems to know whence it came." *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir. 1975). We have previously stated "[t]he debates that led to the Act's passage contain no reference to the Alien Tort Statute, and there is no direct evidence of what the First Congress intended it to accomplish." *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.),* 978 F.2d 493, 498 (9th Cir.1992).

We do not need to reach the issue of whether the law of nations applies to private,

as opposed to governmental conduct. *See Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 206–07 (D.C.Cir.1985) (law of nations does not reach private, nonstate conduct); *IIT,* 519 F.2d at 1015 (violation of law of nations arises only when relationship between states or between individual and state is affected). *Compare Filartiga v. Pena–Irala,* 630 F.2d 876, 880 (2nd Cir.1980) (act of torture committed by state official violated law of nations) *with Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 791, 819 (D.C.Cir.1984) (per curiam) (Edwards, J., concurring and Bork, J., concurring) (affirming dismissal of action by Israeli citizens against PLO terrorists and distinguishing *Filartiga* as involving official action). Deciding whether private conduct is subject to the law of nations would not resolve the case, because the complaint alleges that the Emirate of Abu Dhabi and the Abu Dhabi Finance Department were among the wrongdoers.

■ The wrongs alleged are in substance fraud, breach of fiduciary duty and misappropriation of funds. Although the conduct was international in scope, no violation of what has traditionally been the subject of international law is claimed. International law includes more than international treaties. *See e.g., Estate of Marcos,* 978 F.2d at 499 (official torture); *Filartiga v. Pena–Irala,* 630 F.2d 876, 880 (2nd Cir.1980) (same). But looting of a bank by its insiders, and misrepresentations about the bank's financial condition, have never been in the traditional classification of international law. These are garden variety violations of statutes, banking regulations, and common law. We agree with the view of the Second Circuit, as stated in *IIT:*

> [w]e cannot subscribe to plaintiffs' view that the Eighth Commandment "Thou shalt not steal" is part of the law of nations. While every civilized nation doubtless has this as a part of its legal system, a violation of the law of nations arises only when there has been "a violation by one or more individuals of those standards, rules or customs (a) affecting the relationship

between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings *inter se."*

*IIT,* 519 F.2d at 1015 (quoting *Lopes v. Reederei Richard Schroder,* 225 F.Supp. 292, 297 (E.D.Pa.1963)). That case was conceptually similar to the case at bar, in that it alleged an international scheme of fraud, conversion and corporate waste. *See also Filartiga,* 630 F.2d at 888–89 (distinguishing official torture, actionable under Alien Tort statute, from *IIT* ). The standards alleged to have been violated by the defendants in the case at bar are not of a kind affecting the relationship between states or between an individual and a foreign state, and used by those states for their common good in dealings *inter se.*

Our reasons for adopting the *IIT* rule are well stated in *Filartiga:*

> The requirement that a rule command the "general assent of civilized nations" to become binding upon them all is a stringent one. Were this not so, the courts of one nation might feel free to impose idiosyncratic legal rules upon others, in the name of applying international law.

*Filartiga,* 630 F.2d at 881.

Because appellants' claims of fraud, breach of fiduciary duty, and misappropriation of funds are not appropriately considered breaches of the "law of nations" for purposes of jurisdiction under the Alien Tort Statute, Count IV was properly dismissed.

## D. *RICO*

Most of the complaint purports to allege civil RICO claims. The statute provides that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]" has a cause of action for which treble damages may be recoverable. 18 U.S.C. § 1964(c). Appellants allege that they were depositors in BCCI, and that because it violated the law and collapsed, it failed to pay them the money they were entitled to as depositors. Appellants allege that all four subsections of section 1962 [3]

---

**3.** Section 1962(a) provides that it is "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of

racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any

were violated by some or all defendants, by means of predicate acts ranging from wire and mail fraud to drug transactions and weapons dealing. The defendants include seventy-seven firms and individuals alleged to have looted the bank for personal gain, caused it to loan its money to criminals, caused it to appear more sound than it was to bank regulators, and otherwise to have contributed to its wrongful conduct or its inability to pay its depositors. The bank itself is not a defendant.

■ In order to plead a civil RICO claim, appellants must show that the defendants' violation of section 1962 was the proximate cause of their injury. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992); *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir.1994). Some of the wrongs alleged would tend to increase rather than reduce the ability of the bank to pay its debts. For those wrongs, the appellants have alleged no proximate cause linking the RICO violations with injury to their property.

Appellants have also pleaded various wrongs which had the effect of making BCCI less able to pay its debts. As depositors, the members of the appellant class are creditors of BCCI. *Bank of Marin v. England*, 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966); *Brown v. New York Life Ins. Co.*, 152 F.2d 246, 249 (9th Cir.1945). They allegedly loaned money to BCCI which, because of various wrongs by defendants, it was unable to pay back. To the extent that the alleged wrongs reduced the ability of the bank to pay its debts, or caused it to be in business for a longer time than it should have been so that it could continue to borrow money from depositors fooled about its true

condition, the wrongs would have the practical consequence of harming the depositors.

The question is whether persons whose injury is in this manner indirect have standing to assert a RICO claim. BCCI, the allegedly dishonest and defaulting debtor, is not a defendant. Instead, other people and firms, who allegedly contributed to BCCI's condition, but who themselves had no direct relationship to the appellants and caused them no direct harm, are the defendants. Suppose the "BCCI pirates" looted the bank just as the complaint says. Can a depositor in a bank sue a bank robber?

■ The standing question has been answered persuasively by the Third Circuit, in *Popkin v. Jacoby (In re Sunrise Sec. Litig.)*, 916 F.2d 874, 880 (3d Cir.1990). In that case too, depositors of a failed bank sued the insiders whom they claimed looted it and misrepresented its condition. The claims were substantially the same as in the case at bar:

> The essence of the complaint is that defendants misrepresented the financial condition of [the bank] by failing to disclose that they had mismanaged [the bank] rendering the institution insolvent, and that they had employed deceptive operating practices, which prevented federal and state regulators from acting in a timely manner to forestall the insolvency of [the bank].

*Id.* at 883. The Third Circuit held that depositors asserting a RICO claim because the bank had become unable to pay its debts should be treated the same as shareholders in a corporation. For both classes, where the harm is to all the members, and the injuries claimed by the plaintiffs are not separate and distinct from those to shareholders or depositors generally, the RICO claim is derivative and there is no standing on the

interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

Section 1962(b) provides that it is "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

Section 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

Finally, section 1962(d) provides that it is "unlawful for any person to conspire to violate" the preceding three subsections.

part of the shareholders or depositors to assert it.

The Second Circuit has ruled the same way.

> As a general rule, wrongdoing by bank officers that adversely affects all depositors creates a liability which is an asset of the bank, and only the bank or its receiver may sue for its recovery.

*Adato v. Kagan,* 599 F.2d 1111, 1117 (2d Cir.1979).

*Sunrise*'s analogy to shareholder suits is sound. Creditors of a bankrupt corporation generally do not have standing under RICO. *Manson v. Stacescu,* 11 F.3d 1127, 1130 (2d Cir.1993). "The creditor generally sustains injury only because he has a claim against the corporation. The creditor's injury is derivative of that of the corporation and is not caused proximately by the RICO violations." *Id.* When a creditor suffers injury that is "independent of the firm's fate," his injury is direct and he may pursue his own remedy; otherwise the injury is derivative and the creditor must take his "place in line" as a creditor in the bankruptcy action. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1336–37 (7th Cir. 1989). *Cf. Sparling v. Hoffman Constr. Co., Inc.,* 864 F.2d 635, 640 (9th Cir.1988) (shareholder lacks standing to assert RICO claim unless he shows either an injury distinct from that to other shareholders or a special duty owed by the defendant to the shareholder).

The rationale supporting the analogy is compelling. "[P]ermitting depositors to bring individual actions for such injuries [ ] would invariably impair the rights of other general creditors and claimants with superior interests." *Sunrise,* 916 F.2d at 887. Under the facts of *Sunrise,*

> continuation of plaintiffs' suit could disrupt the efforts of FDIC to recover the [bank's] assets, which were depleted by defendants' mismanagement and wrongdoing, for equitable distribution among all depositors and creditors in accordance with the federal priority scheme.... According to the FDIC, permitting plaintiffs to sue directly for claims emanating from injury to the [bank] would circumvent the priority

> scheme by enabling depositors to recover the [bank's] assets in advance of other general creditors and claimants with superior interests, such as secured creditors. This result, argues FDIC, is both inequitable and inefficient, and threatens to further complicate the immense task of liquidating the [bank's] assets.

*Id.* at 888–89 (emphasis in original). The Seventh Circuit has made the same point in the context of a shareholder's RICO claim, noting that allowing the derivative suit would lead to double counting of damages and would interfere with an equitable liquidation process:

> Recovery by the firm, followed by division according to entitlements, is especially important when the firm has landed in bankruptcy. Suits by shareholders, guarantors, and the like may well be efforts to divert the debtor's assets—to pay off one set of creditors ... while keeping the proceeds out of the hands of the firm's other creditors.

*Mid–State,* 877 F.2d at 1336.

This line of reasoning applies fully to the case at bar. BCCI is being liquidated in international proceedings in Luxembourg. Its assets located in the United States have been forfeited and are subject to control of the Justice Department. The appellants in this case have claims similar to those of many other potential claimants. Their claims, if allowed in this lawsuit, would enable them to jump ahead of other creditors in priority and obtain greater shares of the failed bank's assets and of the assets of any wrongdoers who may owe money to the failed bank on account of their wrongs. *See United States v. BCCI Holdings (Luxembourg), S.A.,* 46 F.3d 1185 (D.C.Cir.1995). Half of the sums recovered will be surrendered to a global liquidation fund set up to facilitate a "general global distribution to creditors and depositors." *Id.* at 1187. The other half has been reserved for the Attorney General's discretionary allocation to purposes including offsetting losses to the Federal Deposit Insurance Corporation, *id.,* and "protect[ing] the rights of innocent persons." *Id.* at 1192, *quoting* 18 U.S.C. § 1963(g)(1). Re-

cently, these appellants attempted to convince one of our sister circuits that they were entitled to an interest in the property so forfeited, the "nature and extent" of which interest could be found in the complaint filed in the case at bar. *Id.* at 1188. Appellants' attempt to jump in line ahead of other creditors was rebuffed in that case, and it is rebuffed here.

Appellants would have us distinguish *Sunrise* and the other cases on derivative claims, on the basis of *Hayes v. Gross,* 982 F.2d 104 (3d Cir.1992). In *Hayes,* purchasers of stock alleged that they paid too much because of fraud on the market, and sued the officers and directors of the corporation under the Securities Exchange Act of 1934. The Third Circuit distinguished *Sunrise,* and held that the claim was not derivative. It reasoned that the injury claimed was distinct from the injury to the corporation and the indirect injury to stockholders generally, and also that the claim would neither prejudice the corporation and its other stockholders nor permit a double recovery for the same injury. In that case, the harm would of course be only to the shareholders who bought in a market tainted by the misrepresentations, not to those who had bought before, and not to the corporation. We need not decide whether we would follow *Hayes,* because the facts of the case at bar are analogous to *Sunrise,* not *Hayes.*

Because the RICO claims were all properly dismissed for lack of standing, as derivative, we do not reach the questions raised by the parties as to the extraterritorial reach of RICO. We understand the argument to be whether Congress has the power to regulate the foreign conduct at issue, not whether the district court had jurisdiction to decide whether a claim upon which relief could be granted had been pleaded. We assume without deciding that RICO would apply to the foreign wrongs. We do not reach the other rationales articulated by the district court as a basis for dismissal.

AFFIRMED.