PHARMACARE, et al., Plaintiffs,

v.

CAREMARK, et al., Defendants.

Civil No. 96–00474 ACK.

United States District Court,
D. Hawai'i.

Dec. 12, 1996.

Michael K. Livingston, Davis & Levin, Sharon R. Himeno, Price, Okamoto, Himeno & Lum, Honolulu, HI, Bonny E. Sweeney, Leonard B. Simon, Kevin P. Roddy, Stephen H. Swartz, Dennis Stewart, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for plaintiffs.

Robert J. Hackman, Goodsill, Anderson, Quinn & Stifel, Alii Place, Honolulu, HI, Howard M. Pearl, Winston & Strawn, Chicago, IL, for defendants.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS. THE COURT GRANTS DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND REGARDING: (1) PLAINTIFFS' WIRE AND MAIL FRAUD CLAIMS; AND (2) PLAINTIFFS' § 1962(a) CLAIM. THE COURT DENIES THE REMAINDER OF DEFENDANTS' MOTION TO DISMISS*

KAY, Chief Judge.

## BACKGROUND

This case concerns the alternate site infusion therapy industry. Alternate site infusion therapies consist of services involving the administration of medication, nutritional solutions and fluids to a patient outside of a hospital. The most common therapies include total parental nutrition, enternal nutrition, antibiotic, antiviral and antifungal therapies, chemotherapy, pain management therapy, human growth therapy and treatments for hemophilia and HIV AIDS. Due to their medical nature, alternative site infusion therapies are typically prescribed by a patient's doctor. From February 1986 until April 1995, when it sold its alternate site infusion therapy business, Caremark, Inc. ("Caremark") was the largest company in this industry.

During this time, Caremark underwent certain corporate transformations. Prior to 1987, Caremark was known as Home Health Care of America. From approximately August 1987 to about November 1992, Caremark was owned by Baxter Healthcare Corporation ("Baxter Healthcare"), a Delaware Corporation with its principal place of business in Illinois. Baxter Healthcare is a subsidiary of Baxter International, Inc ("Baxter"), a Delaware corporation with its headquarters in Illinois. In November, 1992, Caremark became a subsidiary of Caremark International, Inc. (collectively Caremark, Caremark International, Inc., Baxter Healthcare and Baxter referred to as "Defendants").

This case came about because of two plea agreements entered into by Caremark in the District of Minnesota ("Minnesota plea") and

the Southern District of Ohio ("Ohio plea"). In the Minnesota plea, entered into on June 20, 1995, Caremark pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341 and agreed to pay a fine of $9,000,000. Two days later on June 22, 1995, Caremark entered into the Ohio plea where it pled guilty to mail fraud and paid a $20,000,000 fine. The basis for these agreements was Caremark's improper payments to physicians in exchange for the physicians' referrals of patients.

The significance and scope of these agreements constitute the gist of this action. The Defendants argue that the agreements merely establish wrongdoing with regard to two doctors [1] in the Minneapolis and Columbus area concerning the Federal Employees Health Benefit Program ("FEHBP") and the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), two federal programs.

Caremark's competitors disagree. They argue that these agreements evidence a nationwide scheme of commercial bribery. In fact, three competitors [2] ("Plaintiffs") filed a nationwide class action on May 20, 1996 against the Defendants. The complaint asserts that Defendants' scheme violated four different statutes: (1) Clayton Act § 2(c) as amended by the Robinson–Patman Act, 15 U.S.C. § 13(c) (" § 2(c)"); (2) RICO 18 U.S.C. § 1962(a) and (d) (" § 1962(a)"); (3) RICO 18 U.S.C. § 1962(c) and (d) (" § 1962(c)"); and (4) the California Business & Professions Code § 17200 concerning unfair and fraudulent business practices ("pendent claim"). For these violations, Plaintiffs seek general damages (trebled as provided by law), attorney's fees, an injunction prohibiting the Defendants from continuing their actions, restitution of Defendants' ill-gotten gains, and the imposition of a constructive trust.

On August 26, 1996, the Defendants filed a motion to dismiss. With regard to the RICO claims, Defendants argue that Plaintiffs' complaint fails to: (1) adequately establish the predicate acts of racketeering; (2) satisfy RICO's proximate cause and standing requirement; (3) establish the existence of an enterprise necessary for § 1962(c); and (4) establish that Plaintiffs were injured by Defendants' use of income derived from racketeering activity as required by § 1962(a). As to Plaintiffs' § 2(c) claim, Defendants argue that dismissal is appropriate because: (1) Plaintiffs lack the requisite standing; (2) Doctors do not owe their patients a commercial duty; and (3) Plaintiffs failed to plead that doctors provided no services in return for the alleged payments. Finally, with regard to the pendent claim, Defendants sought dismissal on the grounds that: (1) the injunction sought is unnecessary; (2) the Plaintiffs lack standing; and (3) the relief sought would violate the Commerce Clause of the Federal Constitution.

Plaintiffs responded to all these arguments in their October 31, 1996 opposition. The Defendants filed a reply on November 7, 1996.

### STANDARD OF REVIEW

#### 1. Motion to Dismiss

Under Fed.R.Civ.P. 12(b)(6), in determining whether a motion to dismiss for failure to state a claim upon which relief can be granted, this Court must accept as true the plaintiff's allegations contained in the complaint and view them in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Wileman Bros. & Elliott, Inc. v. Giannini,* 909 F.2d 332, 334 (9th Cir.1990); *Shah v. County of Los Angeles,* 797 F.2d 743, 745 (9th Cir.1986). Thus, the complaint must stand unless it appears beyond doubt that the plaintiff has alleged no facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1990). A complaint may be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal

---

1. The doctors are Dr. Neufeld of Columbus, Ohio and Dr. Brown of Minneapolis, Minnesota.

2. The competitors are (1) Value Drug, Ltd., a Hawaii corporation; (2) Creative Health Care Services, an Arizona corporation; and (3) Home Parenteral Care, Inc., an Oregon corporation.

theory or (2) insufficient facts under a cognizable legal theory. *Balistreri,* 901 F.2d at 699; *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984).

In essence, as the Ninth Circuit has stated, "[t]he issue is not whether a plaintiff's success on the merits is likely but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiffs' claims. *Id.*

### DISCUSSION

Although the Plaintiffs' class has not been certified, the Court will decide the issues presented in this motion. *See Wright v. Schock,* 742 F.2d 541 (9th Cir.1984) (citing cases which have allowed a court to decide a motion to dismiss before certification.) The Court, however, will assume that the suit is a class action for purposes of this motion.[3] *See City Of Inglewood v. City of Los Angeles,* 451 F.2d 948 (9th Cir.1972) (holding that the district court was proper in assuming that suit was class action for purposes of deciding a Fed.R.Civ.P. § 12(b)(1) motion.) With that said, the Court will discuss the claims in the order the Defendants attacked them in their motion to dismiss.[4]

### I. Plaintiffs' have established all the elements required for their 1962(c) claim

To establish its RICO § 1962(c) claim, the Plaintiffs must establish: (1) conduct,[5] (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Sedima v. Imrex Co. Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Defendants first ar-

gue that Plaintiffs have failed to plead the third and fourth elements, i.e. a pattern of racketeering activity.

### A. Plaintiffs' Have Adequately Established a Pattern of Racketeering Activity

RICO defines the term "pattern of racketeering activity" as requiring "at least two acts of racketeering activity ... the last of which occurred within ten years after the commission of a prior act of racketeering activity." RICO, 18 U.S.C. § 1961(5). Aside from the minimal requirement of showing two predicate acts existed, RICO nowhere addresses the meaning of the term "pattern" as used throughout the statute. In *H.J. Inc. v. Northwestern Bell Telephone Company,* the United States Supreme Court sought to develop a meaningful concept of that term. 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Drawing on dicta from a previous opinion in which the issue was considered, *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), the Supreme Court divined from RICO's legislative history a two-pronged framework for analysis: "[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Northwestern Bell,* 492 U.S. at 239, 109 S.Ct. at 2900. Thus, the determination of whether a RICO plaintiff is able to establish a pattern of racketeering activity necessarily entails an initial determination of whether the defendants committed two or more predicate acts within the meaning of the RICO statute. *See* 18 U.S.C. § 1965(c). And if so, whether the predicate acts were related in manner such that they created a threat of continued unlawful activity. *Northwestern Bell,* 492 U.S. at 239–43, 109 S.Ct. at 2900–2903.

---

**3.** If the class is ultimately not certified, therefore, this order, or portions thereof, may no longer be applicable. The Court is mindful that pursuant to Fed.R.Civ.P. 23(c)(1) the issue of class certification must be ruled on "as soon as practicable." *See e.g. Wright,* 742 F.2d at 543.

**4.** Defendants did not specifically challenge Plaintiffs' § 1962(d) claims which alleged that Defen-

dants conspired to violate § 1962(c) and § 1962(a). *See* Plaintiffs' Complaint at ¶ 48, 55. The Court, therefore, will not address Plaintiffs' 1962(d) claims.

**5.** Defendants do not argue that Plaintiffs' failed to establish this element.

### 1. *Predicate Acts*

Congress has enumerated the predicate acts which may form the basis for a RICO claim in 18 U.S.C. § 1961(1). Section 1961(1) lists five different categories of criminal offenses that could potentially constitute predicate acts. Subsection (A) provides that "any act or threat" involving a variety of criminal offenses "which [are] *chargeable*" under state law may serve as a RICO predicate. 18 U.S.C. § 1961(1)(A) (emphasis added) Subsection (B) provides that "any act which is *indictable*" under any of a variety of enumerated federal criminal statutes may serve as a RICO predicate. 18 U.S.C. § 1961(1)(B) (emphasis added). Plaintiffs rely on subsection (B) to establish its RICO predicates claiming that Defendants committed various acts in violation of the following statutes delineated in subsection (B): (1) bribery or attempted bribery in violation of 18 U.S.C. § 201; (2) mail fraud in violation of 18 U.S.C. § 1341; (3) wire fraud in violation of 18 U.S.C. § 1343; and (4) interstate and/or foreign travel in violation of 18 U.S.C. § 1952.[6]

### a. *Doctors involved with the CHAMPUS and FEHPB Programs Qualify as "Public Officials" for purposes of the federal bribery statute*

■ Defendants argue that 18 U.S.C. § 201 only applies to bribery of public officials or bribery connected to testimony to be given at trial and thus does not apply to the facts alleged by Plaintiffs. See Defendants' Motion to Dismiss at pgs. 6–7. In response, Plaintiffs argue that although 18 U.S.C. § 201 applies only to federal officials, the Supreme Court has defined that term to include any "person [who] occupies a position of public trust with official federal responsibilities." *Dixson v. United States*, 465 U.S. 482, 496, 104 S.Ct. 1172, 1179–80, 79 L.Ed.2d 458 (1984). Under this expansive definition, Plaintiffs argue that Defendants' bribery of persons like Doctors Neufeld and Brown rose to bribery of public officials.

The Court finds that Plaintiffs' argument has merit. In *Dixson*, the Supreme Court found that the Petitioner occupied a position of official responsibility because he "allocat[ed] federal resources, pursuant to complex statutory and regulatory guidelines, in the form of [federal] contracts." *Id.* at 497, 104 S.Ct. at 1180. For purposes of a motion to dismiss, that is precisely the authority the doctors were given in this case. *See De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978) (holding that motion to dismiss inappropriate unless Plaintiff cannot establish claim "under any set of facts.") Under a generous reading of the facts, the doctors who worked with these programs "allocat[ed] federal resources" in referring the federal employees' alternative site infusion therapy contracts to Caremark. Moreover, once the federal employee chose the only referred company, i.e. Caremark, a "federal contract"[7] was created between Caremark and the FEHBP and CHAMPUS programs. Therefore, when the doctors accepted "bribes to influence their official decisions," they violated the 18 U.S.C. § 201. *Id.* Accordingly, the Court finds that Plaintiffs have established the commission of two predicate acts of bribery for purposes of surviving a motion to dismiss.[8]

### b. *Because the Court has found that the Plaintiffs have established the predicate acts of bribery, a Travel Act violation can be established by merely alleging that Defendants' used the mail to bribe the physicians*

■ To establish a Travel Act violation, the plaintiff need only prove that the defendant "use[d] any facility in interstate or foreign commerce, **including the mail,** with intent to . . . (3) carry on . . . bribery . . . in violation of the laws . . . of the United States." 18 U.S.C. § 1952(a)(3) and (b).

---

**6.** The Court will not address Plaintiffs' state law bribery claims because it finds that the complaint does not allege them. See Plaintiffs' Complaint ¶ 47 ( "defendants have engaged in (a) bribery, or attempted bribery, in violation of 18 U.S.C. § 201.") If the Plaintiffs want to allege state law bribery, they can amend their complaint.

**7.** Defendants would provide the therapy to the employee in exchange for payment from the federal government.

**8.** This analysis, however, applies only to scenarios involving federal insurance programs.

The Court has already determined that accepting Plaintiffs allegations as true, the Plaintiffs have established a violation of the federal bribery laws. To establish a Travel Act violation, therefore, the Plaintiffs need only prove that Defendants used the mail with the intent to commit those acts of bribery.

Through the plea agreements incorporated into the Complaint,[9] Plaintiffs have clearly met this burden. By pleading guilty to mail fraud, the Defendants acknowledged that they "intended to devise a scheme"—which the Court has found could be indictable under the bribery statute—and "used the United States Postal Service for the purpose of executing the scheme." *See* Minnesota Plea at pg. 3–4. Or in other words, Defendants admitted to using the mail with the intent to commit bribery, which is a violation of the Travel Act. Accordingly, the Court finds that the Plaintiffs have established at least two Travel Act violations for purposes of surviving a motion to dismiss.

c. *Plaintiffs' mail and wire fraud claims do not allege that Defendants' purported scheme or artifice deprived Plaintiff of any property protected by the mail or wire fraud statutes*

■ To establish a claim for mail or wire fraud,[10] the Plaintiffs need to establish that Defendants (1) formed a scheme or artifice to defraud; (2) used the United States mails (or, for wire fraud, the use of wire, radio, or television communications); (3) with the specific intent to deceive or defraud. 18 U.S.C. § 1341, § 1343, § 1346; *see also Sun Savings and Loan Association v. Dierdorff,* 825 F.2d 187 (9th Cir.1987). "Mail fraud also requires the intent to defraud someone of money or property." *United States v. Carpenter,* 95 F.3d 773, 776 (9th Cir.1996).

At first glance, the Plaintiffs' complaint appears to fulfill these criteria. In the complaint, Plaintiffs allege that Defendants formed a scheme of bribery and kickbacks to doctors in exchange for their referrals. The complaint also states, through its incorporation of the plea agreements, that Caremark used the United States mails in furtherance of the scheme and that the Defendants had the intent to deceive.[11] *See* Complaint at ¶ 32.

Plaintiffs fail, however, to allege that the Defendants' scheme deprived them of property protected by the mail fraud statute. Plaintiffs argue that Defendants' scheme deprived them of two separate property rights: (1) the right to a level playing field; and (2) the right of the physicians' patients to honest services. See Plaintiffs' Opposition at pg. 47.

In response to Plaintiffs' first argument, Defendants rely upon the Ninth Circuit's decision in *Lancaster Community Hospital v. Antelope Valley Hospital,* 940 F.2d 397, 405 (9th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992), in arguing that "market share"[12] is not a property right protected by the mail and/or wire

---

**9.** Exhibits submitted with the complaint may be considered as part of the complaint for purposes of a motion to dismiss without converting it into a summary judgment motion. *See Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 (9th Cir.1989). However, other evidence submitted by the parties such as newspaper articles would convert this motion into one for summary judgment. For that reason, this Court has decided to exercise its discretion and disregard that evidence so as not to transform this motion into one for summary judgment. *See e.g. Skyberg v. United Food & Commercial Workers Int'l Union,* 5 F.3d 297, 302 fn. 2 (8th Cir.1993).

**10.** Because the analysis for these counts is identical, the Court will address them together. *See Dischner,* 974 F.2d at 1518 n. 16.

**11.** Defendants' argument that Plaintiffs misconstrue the plea agreements is misplaced. The Court reminds the Defendants that at this junc-ture, the Court must accept as true the Plaintiffs' allegations contained in the complaint and view them in a light most favorable to the Plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Therefore, absent the pleas, the Court still has to accept as true Plaintiffs' allegations concerning a national scheme to defraud. *But see* Fed.R.Civ.P. 9(b); footnote 17, *infra.*

**12.** The Court reads "market share" and the "right to a level playing field" to only have semantic differences. After all, in *Lancaster,* the behavior Plaintiffs accused Defendant of— engaging in kickbacks to gain customers—certainly deprived the Plaintiff of the "right to a level playing field," but the Ninth Circuit instead addressed it as "market share." 940 F.2d at 405.

fraud statute. In *Lancaster*, the Ninth Circuit stated that:

> 'Market share' is neither tangible or intangible property; its loss is far too amorphous a blow to support a claim of mail fraud under the reasoning of *McNally*, 483 U.S. [at] 356–60, 107 S.Ct. at 2879, 2881–82, and *Carpenter*, 484 U.S. at 26, 108 S.Ct. at 321 (newsmatter a commodity traded like any other). Put differently, it might be said that defendants hoped to steal' Lancaster's customers. But it cannot be said that these customers were Lancaster's property.
>
> The 'fraud' Lancaster alleges is in reality nothing more or less than unalloyed anticompetitive conduct. This conduct may be unacceptable, but it is not 'fraud.'

*Id.* at 406. On the surface, this language would seem to control. Plaintiffs allege that they were deprived of potential customers, i.e. market share, because Defendants engaged in a nationwide scheme to defraud. However, two factors prevent the Court from blindly following *Lancaster*.

First, it is unclear whether the language above comprised the holding of the case or was just dicta. Arguably, before exploring the confines of the mail fraud statute, the Ninth Circuit already disposed of the mail fraud claim on the grounds that the Plaintiff had failed to establish a second mailing required to plead a "pattern" of racketeering activity. *Id.* at 405.

Second, the Ninth Circuit in *Lancaster* relied on a case, *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which had been superseded; and a statute, 18 U.S.C. § 1341, which had been amended. *Id.* at fn. 15. Specifically, on November 18, 1988, Congress enacted 18 U.S.C. § 1346 which included a "scheme or artifice to deprive another of the intangible

right of honest services" within the purview of the mail fraud statute. In light of this amendment, therefore, *Lancaster* may not be the strongest precedent for the acts which occurred after November 18, 1988. However, Plaintiffs' complaint seems to include dates as early as February 1986. For these dates (February, 1986 to November, 1988), the Court finds that the reasoning in *Lancaster*, albeit dicta, applies. *See U.S. v. Olano*, 62 F.3d 1180, 1198 (9th Cir.1995) (holding that section 1346 lacks retroactive force) Accordingly, the Court dismisses Plaintiffs' mail and wire fraud claims that precede November, 1988 finding that the Defendants' actions did not come within the mail and wire fraud statutes.[13]

The question remains, however, whether § 1346's amendment of the mail fraud statute altered the reasoning of *Lancaster* by including "market share" within the purview of the statute. The Court does not think so. Section 1346, as interpreted by the Ninth Circuit, simply nullified the *McNally* decision and reinstituted the pre-*McNally* jurisprudence. *See United States v. Dischner*, 960 F.2d 870, 886 n. 16 (1992); *United States v. Thomas*, 32 F.3d 418, 419 (9th Cir.1994); *United States v. DeFries*, 43 F.3d 707 (D.C.Cir.1995); but see *United States v. Brumley*, 79 F.3d 1430 (5th Cir.1996) (holding that § 1346 did not reinstate pre-*McNally* jurisprudence with regard to state actors.)

A review of the pre-*McNally* jurisprudence, moreover, leads to the conclusion that the property rights asserted by the Plaintiff are not covered by the statute. Before *McNally*, "intangible property rights"[14] only encompassed four distinct areas. *See McNally v. United States*, 483 U.S. 350, 362–65, 107 S.Ct. 2875, 2883–84, 97 L.Ed.2d 292 (1987) (Stevens, J. dissenting); *United States v. Brumley*, 79 F.3d 1430, 1433–34 (5th Cir. 1996). These areas included: (1) the "right

---

**13.** The Court is also unpersuaded by the fact that the acts alleged constituted a pattern because whether they were a pattern or not, Congress "cannot criminalize conduct that has already occurred, U.S. Const., Art. I § 9 cl. 3, and mail [and wire] fraud is a criminal offense." *Lancaster*, 940 F.2d at 405; *but see United States v. Paradies*, 98 F.3d 1266, 1284 (11th Cir.1996) (upholding conviction under § 1346 when scheme spanned from 1985 to 1990); *United*

*States v. Garfinkel*, 29 F.3d 1253, 1259–60 (8th Cir.1994); *United States v. Hammen*, 977 F.2d 379, 385 (7th Cir.1992).

**14.** Clearly, neither of the rights asserted—a level playing field or the doctors' fiduciary duty—concern tangible property. Accordingly, they will be analyzed under the "intangible property" portion of the mail fraud statute.

to honest services of their governmental officials;" (2) the "right to an honest election;" (3) the right of employers or unions to have "purchasing agents, brokers, union leaders, and other with **clear fiduciary duties** ... [not] accept[ ] kickbacks or sell[ ] confidential information;" and (4) an individuals "right to privacy and other nonmonetary rights." Of these four, only the latter two could conceivably apply to this case.

None of these areas, however, go so far as to create a property right in market share. In fact, no case creating such a right has been put forward by the Plaintiffs [15], or been found by the Court, except for one district court case which held that the mail fraud statute protects the intangible right to a level playing field. *Pearlstine Distributors v. Freixenet,* 678 F.Supp. 133, 136 (D.S.C.1988). Plaintiffs' reliance on *Pearlstine,* however, does not change the Court's result. The *Pearlstine* case was decided before the enactment of § 1346. Consequently, the Court there was analyzing the same law that the Ninth Circuit analyzed in *Lancaster.* The Ninth Circuit, however, found that the pre—§ 1346 mail fraud statute did not protect market share. Given a choice between following the Ninth Circuit or the district court of South Carolina, the Court obviously follows the Ninth Circuit.

Plaintiffs also assert a property interest in the physicians' patients right to honest services. For this assertion, Plaintiffs rely upon

*United States v. Neufeld,* 908 F.Supp. 491 (S.D.Ohio 1995), a case concerning one of the doctors involved in Defendants' scheme. *Neufeld,* however, undermines Plaintiffs' argument. In *Neufeld,* the Defendant moved to dismiss the indictment which included three mail fraud counts based on the intangible rights theory. After noting the machination of the statute under *McNally* and 18 U.S.C. § 1346, the court dismissed the counts as they pertained to federal and state agencies. *Id.* at 499–500. It did so because "[t]he intangible rights theory of mail and wire fraud is only cognizable, however, when there exists a fiduciary relationship between the victim and the accused," and Dr. Neufeld did not owe any duty to the agencies. *Id.* at 499.

That same reasoning applies here. The doctors alleged to have participated in Defendants' scheme owed a fiduciary duty to the patients but not to the Plaintiffs. Therefore, under the statute, the Plaintiffs did not have an "intangible property" interest in the doctors' actions. Accordingly, even if Defendants' scheme deprived the patients of their doctors' fiduciary duty, the Plaintiffs have not set forth a claim for mail fraud because they hold no property interest in that duty. Accordingly, the Court dismisses Plaintiffs' mail and wire fraud claims [16] finding that Defendants purported scheme or artifice did not deprive Plaintiffs of any property protected by the mail or wire fraud statutes.[17]

---

**15.** Plaintiffs try to portray *In re American Honda Motor Co., Inc.,* 941 F.Supp. 528, 1996 WL 534796, as support for a "market share" theory although the Court did not rely on such a theory. Instead, the Court relied on the Plaintiffs' "contractual rights" to cars. *Id.* at 547 fn. 21. Here, however, Plaintiffs try to assert a property right over the patients absent any contract.

**16.** The Court recognizes the irony in holding that a nationwide class of Plaintiffs have failed to establish their mail fraud claims when the Defendants have pled guilty to two counts of mail fraud. The pleas however concern the taking of tangible property, i.e. money, from the government. *See e.g.* Plaintiffs Complaint, Minnesota Plea Agreement Joint Stipulation of Facts ("Defendant did knowingly devise and intend to devise a scheme and artifice to defraud the FEHBP and CHAMPUS programs and to **obtain money and property** by false and fraudulent premises ...").

**17.** Any effort by Plaintiffs to amend their complaint should bear in mind that Fed.R.Civ.P. § 9(b) requires that mail and wire fraud RICO claims be pleaded "with particularity [as to] the time, place and manner of each act of fraud, plus the role of each defendant in each scheme." *Lancaster Community Hospital v. Antelope Valley Hosp. D.,* 940 F.2d 397, 405 (9th Cir.1991). Only two mailings, however, need be established with particularity. *Id.*

The present Complaint has clearly established the two mailings with regard to the mail fraud action. In the Ohio and Minnesota Pleas, Caremark admits to using the mails twice at a certain time, place and manner in violation of the mail fraud statute. *See* Plaintiff's Complaint, Exhibits B and D. The agreements, however, do not refer to Caremark's commission of wire fraud. Consequently, the Complaint does not plead the wire fraud claim with the requisite particularity. Perhaps, this case could justify a relaxation of the standard but at this time such a determination

**2.** *Plaintiffs have met the "pattern" requirement with regard to the predicate acts*

■ According to *Northwestern Bell,* "[t]o establish a RICO pattern it must ... be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." 492 U.S. at 240, 109 S.Ct. at 2901. The *Northwestern Bell* Court also explained that there are two alternative ways to satisfy the continuity prong: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902.

### a. *Closed-ended continuity*

"A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Northwestern Bell,* 492 U.S. at 242, 109 S.Ct. at 2902. This formulation raises the question of how long a substantial period of time is. The Supreme Court has declined to draw a bright line of "substantiality." *Id.* at 243, 109 S.Ct. at 2902–03. The Supreme Court did state however that "a few weeks or months" is not enough. *Id.* at 242, 109 S.Ct. at 2902.

Here, the alleged predicates occurred over nine years. *See* Plaintiff's complaint at ¶ 16. Such a period of time clearly qualifies as a "substantial period of time." *See e.g. United States v. Dischner,* 974 F.2d 1502, 1510–11 (9th Cir.1992) (finding three years to be a "substantial period of time" for a bribery scheme). In addition, the predicates that the Plaintiffs have alleged—the violation of the bribery and Travel Act statutes—are all related to the scheme Plaintiffs allege: the bribing of doctors in exchange for referrals.[18]

Accordingly, the Court finds that the Plaintiffs have met the continuity element of its RICO claim.

## II. *Plaintiffs have standing to pursue their RICO claims*

■ To have standing to assert its RICO claim, Plaintiffs must establish that Defendants' predicate acts actually and proximately caused Plaintiffs' financial loss. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268–270, 112 S.Ct. 1311, 1317–19, 117 L.Ed.2d 532 (1992).

Defendants rely on two Ninth Circuit decisions in arguing that the Plaintiffs do not have standing to assert their RICO claims. *See Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924, 928 (9th Cir.1994); *Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1311 (9th Cir.1992). In their reply, Defendants even go so far to say that *"Imagineering* is directly on point." See Defendants' Reply at pg. 25. The Court disagrees.

In *Imagineering,* a class of minority and women owned businesses ("MWBEs") brought a RICO action against various prime contractors alleging that the prime contractors engaged in a scheme to avoid federal set aside regulations. *Imagineering, Inc.,* 976 F.2d at 1307. The district court dismissed their claims for lack of standing and the Ninth Circuit affirmed. According to the Defendants, this result should decide this case. What Defendants overlook is that the class in *Imagineering* were **not** competitors of the Defendants. Rather, the class consisted of **subcontractors** who still needed to be chosen by a prime contractor before receiving a contract. *Id.* at 1310–1311. Thus, the Plaintiffs in *Imagineering* were asserting a two-tier injury, i.e. if Defendant did not act improperly, Firm A would have been picked and in turn Firm A would have picked us. In this case, however, the class consists of direct competitors of the Defendants. Thus,

---

would be premature. *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987) (relaxing the 9(b) particularity requirement concerning "matters peculiarly within the opposing party's knowledge ... [because] **in cases of corporate fraud,** the plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing.") *Id.*

**18.** Finally, in their 120 pages of papers filed in support of this motion, the Defendants do not contest the fact that if the Plaintiffs established the existence of predicate acts, the requirement for a pattern would not also be fulfilled.

there is only a one-tier injury, i.e. if Defendants did not act improperly, Plaintiff may have received the alternative site infusion therapy business. For *Imagineering* to apply, a beneficiary of the Plaintiffs—like a pharmaceutical supplier—asserting the loss of greater sales would have to be bringing the suit. That is not the case here.[19]

Nevertheless, the Plaintiffs' causation requirement is a bit attenuated. Actual causation is not so difficult to find; "but for" the Defendants paying doctors for their referrals, some of the Plaintiffs would have received alternative infusion site therapy contracts.

The "proximate causation" component, however, is somewhat more difficult. The Supreme Court has held that common law notions of proximate cause apply in civil RICO claims. *Holmes,* 503 U.S. 258, 268–69, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992). Applying common law principles, it can be argued that the laws Defendants allegedly violated were enacted to protect the patients, not its competitors. · *See Israel Travel Advisory v. Israel Iden. Tours,* 61 F.3d 1250, 1257 (7th Cir.1995); *Lancaster,* 940 F.2d at 405 (9th Cir.1991).

The Court, however, finds this view myopic. Instead the Court believes that the common law notion of foreseeability should control. *See Mid Atlantic Telecom v. Long Distance Services,* 18 F.3d 260, 263 ("in conducting the traditional common law proximate cause analysis, therefore, the courts should focus on the temporal and circumstantial relationship between the defendant's conduct and the injury suffered by the plaintiff, and the foreseeability that intervening events would cause injury.") Applying foreseeability principles, Defendants' alleged perpetration of fraud on its patients could foreseeably affect the Plaintiffs who are also trying to entice those same customers.

In addition, Plaintiffs have pled that they were the targets of the fraud. With regard to this argument, the Court notes that "given the opportunity to engage in discovery, [Plaintiffs] may be able to show that while the scheme was initially aimed only at defrauding [Defendants'] customers, [Defendants] broadened the sweep of intrigue to include [Plaintiffs] as a direct target (i.e., to obtain an unfair competitive advantage in recruiting [Plaintiffs'] customers.)" *Id.*

Accordingly, the Court finds that Plaintiffs have established the causation/standing requirement set out by *Holmes.*[20]

### III. *Plaintiffs have fulfilled the requirements for Pleading an "enterprise"*

RICO defines an "enterprise" as either (1) "any individual, partnership, corporation, association, or other legal entity" or (2) "any union or group of individuals associated in fact although not a legal entity ('associated-in-fact enterprise')." 18 U.S.C. § 1961(4); *see also United States v. Turkette,* 452 U.S. 576, 581–582, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). In their complaint, Plaintiffs invoke the latter theory by pleading that: (1) Caremark, Baxter Healthcare, Baxter and the doctors who received bribes constitute an "associated-in-fact enterprise;" or (2) Caremark, Baxter Healthcare, and Baxter constitute an "associated-in-fact enterprise."

To adequately plead the "associated-in-fact enterprise", the Plaintiffs must prove: (1) that the enterprise has "an existence beyond

19. Defendants' other case, *Pillsbury, Madison & Sutro v. Lerner,* 31 F.3d 924 (9th Cir.1994), also involved a two-tiered or "pass on" scenario. In *Pillsbury,* the plaintiffs, a law firm, sued various entities over a raise in their rent which they alleged was due to a money laundering and mail fraud scheme involving the likes of Michael Milken. *Id.* The Court found that the law firm lacked standing because it was a **subtenant** of the building. *Id.* Its rent increase, therefore, depended on the tenant "passing on" its rent increase to the plaintiffs. *Id.* at 928–9. Thus, *Pillsbury* is not applicable to this case, which only involves a one-tiered injury.

20. Moreover, in discussing the need for establishing proximate cause in a Civil RICO action, the Supreme Court relied on causation principles enunciated in antitrust cases. Holmes, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532; *see also Mid Atlantic Telecom v. Long Distance Services,* 18 F.3d at 263; *but see Israel Travel Advisory Service v. Israel Iden. Tours,* 61 F.3d 1250, 1257.

Under causation principles of antitrust law, Plaintiffs have standing. *See* Discussion, supra pg. 29.

**1422**

that which is merely necessary to commit the predicate acts of racketeering;" and (2) the enterprise must have "some sort of structure for the making of the decisions, whether it be hierarchical or consensual." *Chang v. Chen*, 80 F.3d 1293, 1299 (9th Cir.1996).

1. *Under Ninth Circuit case law, the association-in-fact consisting of the Defendants and the doctors fulfills the requirement that the entity have a separate existence*

Defendants argue that the "associated-in-fact enterprise" consisting of Caremark, Baxter Healthcare, Baxter and the doctors fails because it does not distinguish between the enterprise and the pattern of racketeering. This argument has merit.

In rebuttal, Plaintiffs argue that the "daily activities of the enterprise include the physicians' referral of patients to providers of alternate site infusion therapy." *See* RICO case statement ¶ 8. Yet, the only physicians in the enterprise are the "doctors to whom Baxter and/or Caremark paid bribes or kickbacks." See Plaintiffs' Complaint at ¶ 53. Thus, the physicians' referrals comprise the very act that Plaintiffs allege constitutes the racketeering activity, i.e. the doctors' referral of patients in exchange for bribes.

In their opposition, Plaintiffs put forward a second distinction why their enterprise has a separate existence other than the racketeering activity, namely, that Caremark is a corporation. Plaintiffs' Opposition at pg. 24. As Defendants point out, however, to accept this argument is to accept a *per se* rule that any enterprise that contains a corporation fulfills the distinction requirement. Such a rule would seem to fly in the face of *Chang*, other Circuits' application of rule that *Chang* adopts, and the reasons for the "distinction" rule.

■ In *Chang*, the Ninth Circuit addressed the "minimum requirement for an associated in fact enterprise." 80 F.3d at 1297. After surveying other Circuits' approach, the Court adopted a rule that "requires a **RICO enterprise** to have an ascertainable structure separate and apart from the racketeering activity." *Id.* (emphasis

added). This Court interprets that holding to require the "associated-in-fact" enterprise as a whole to have a separate existence, not merely one player in the enterprise to have a separate existence.

The cases followed by the Ninth Circuit in *Chang* support this interpretation. *Id.* at 1297–1298. For instance in *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438, 441 (5th Cir.1987), a cattle business (and customer of the bank) sued the bank, its holding company and three bank employees in a civil RICO action for mail fraud committed when they overcharged interest on certain loans. *Id.* at 439. The jury awarded the customer $2,899,796.63 which the district court set aside on a j.n.o.v. motion. *Id.* at 440–41. The Fifth Circuit affirmed. It found that

> Plaintiffs wholly failed to establish the existence of any entity separate and apart from the bank. In this case, the alleged racketeering activity forming the predicate of the RICO charge was mail fraud—the mailing of false statements requesting payment of interest in excess of the agreed amount. The mailing of loan statements was an activity of the bank. **There is no evidence of any other activity on behalf of the enterprise.**
>
> In addition, there was no evidence presented that the five associates functioned as a continuing unit or formed an ongoing association. No connection was shown between the three individuals and the holding company.

This analysis squarely applies to this case. Here was a bank which undoubtedly had other customers—or a separate existence other than the racketeering—but the Fifth Circuit disregarded that and looked solely to whether the enterprise, as a whole, had a separate existence. Finding that it did not, the Fifth Circuit found the "enterprise" element unproved and affirmed dismissal of the Civil Rico claim.

Finally, the reasons behind *Chang* also cut against the Plaintiffs' argument. The *Chang* court did not want to "render the enterprise element superfluous." 80 F.3d at 1298. Instead, it wanted to respect the "centrality of the enterprise element in the statutory [RICO] scheme." *Id.* To find the enterprise

element fulfilled simply by including a corporation, however, would lead to the very results the Ninth Circuit hoped to avoid. No matter how decentralized or brief the actors involvement may have been, they could become an enterprise under RICO if one of the actors is a corporation.

■ Nevertheless, in another decision, the Ninth Circuit seems to clearly state that "[t]he participation of a corporation in a racketeering scheme is sufficient, of itself, to give the enterprise a structure separate from the racketeering activity: corporate entities have a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure." *Webster v. Omnitrition Intern. Inc.*, 79 F.3d 776, 786 (9th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 174, 136 L.Ed.2d 115. Although this case seems to contradict principles underlying *Chang,* the cases can be harmonized. Read together, *Webster* and *Chang* set forth the following rule: an enterprise must have "an existence beyond that which is merely necessary to commit the predicate acts of racketeering " and "some sort of structure for the making of the decisions," but this requirement may be fulfilled by the simple inclusion of a corporation as a participant in the enterprise. According to this conflicted rule, the Court finds that the Plaintiffs have established the enterprise element.[21]

**IV. *Plaintiffs' 1962(a) is dismissed without prejudice because Plaintiffs have failed to allege facts that show they have been injured by the investment of racketeering income***

■ Section 1962(a) addresses entirely different behavior than § 1962(c). The latter provision merely prohibits racketeering conduct through an enterprise whereas § 1962(a) prohibits the income derived from such activity to be invested in the operation of any entity. *See* 18 U.S.C. § 1962.

---

**21.** This enterprise fulfills another requirement that the defendant must be different than the enterprise. The Ninth Circuit clearly allows some defendants to also be members of the alleged association-in-fact enterprise. *River City*

Acknowledging the distinction between the two provisions, the Ninth Circuit has created two different standards. "[A] plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income." *Nugget Hydroelectric v. Pacific Gas and Electric,* 981 F.2d 429, 437 (9th Cir.1992). In an effort to abide by this standard, the Plaintiff in *Nugget* "alleg[ed] that PG & E received racketeering income and used it in a way that injured Nugget." *Id.* The Ninth Circuit rejected these allegations finding them "general, conclusory, and vague." *Id.*

Plaintiffs' allegations do not fare much better. In their complaint, Plaintiffs allege that Defendants "derived substantial income through the pattern of racketeering activity detailed herein ... and used or invested such income, or the proceeds of such income, in the establishment of and operation of the above-referenced enterprise[s]." Plaintiffs' Complaint at ¶ 48. It is hard to imagine a claim less devoid of facts. Accordingly, under *Nugget,* the Court finds that Plaintiffs have failed to state a claim under § 1962(a) but grants the Plaintiffs leave to amend so they can meet the Ninth Circuit's specificity requirements.

**V. *Robinson-Patnam Act***

Defendants do not deny that § 2(c) of the Robinson–Patnam Act applies to cases of "commercial bribery tending to undermine the fiduciary relationship between a buyer and its agent ... involving the sale or purchase of goods." *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851, 858 (9th Cir.1965). Instead, the Defendants seek dismissal because: (1) the Plaintiffs lack standing; (2) the physicians do not owe the type of duty required for a claim under § 2(c); and (3) Plaintiffs fail to plead that doctors provided no services in return for the payments.

*Markets v. Fleming Foods West,* 960 F.2d 1458, 1461 (9th Cir.1992) ("in multiple-defendant RICO cases," some of the individual defendants may also be identified as members of the alleged association-in-fact enterprise).

1. At *the pleading stage, Plaintiffs' allegations of economic injury confer standing because Plaintiffs have no way of knowing the scope of Defendants' scheme*

■ Competitors of a seller involved in commercial bribery have standing under § 2(c) if they suffer economic injury. *See Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851, 858 (9th Cir.1965); *Larry R. George Sales Co. v. Cool Attic Corporation,* 587 F.2d 266, 272 (5th Cir.1979) (holding that only competitors of the firm which bribed a buyer's agent would have standing); *Bunker Ramo Corporation v. Cywan,* 511 F.Supp. 531 (N.D.Ill.1981) (holding that only competitors of the company paying bribes had standing); *Municipality of Anchorage v. Hitachi Cable,* 547 F.Supp. 633 (D.Alaska 1982) (expanding on *Larry R.'s* standing discussion to include that company can sue when company's agents are bribed); *NL Industries, Inc. v. Gulf & Western Industries, Inc.,* 650 F.Supp. 1115, 1123 (holding that competitor who suffered commercial disadvantage because of bribes made to buyer had standing). To fulfill the economic injury tenet, the competitor must establish a " 'physical and economic nexus' between the alleged violation and the harm to the plaintiff." *NL Industries,* 650 F.Supp. 1115, 1123 (quoting *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478, 102 S.Ct. 2540, 2547–48, 73 L.Ed.2d 149 (1982)).

The Plaintiffs have alleged that Defendants' behavior has caused them "lost sales which they otherwise would have made and, as a result, have been injured in their business or property and have suffered multimillion dollar damages." Plaintiffs' Complaint at ¶ 37. Although Plaintiffs' allegations of injury will never be accused of being overly specific, the Court notes the Supreme Court's credo that "in antitrust cases, where the 'proof is largely in the hands of the alleged conspirators,' [citations omitted], dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). This credo has particular application to this case. Without knowing how many physicians Defendants bribed, the Plaintiffs cannot know which sales they lost to natural competition and which they lost to the corrupting influence of bribery. Accordingly, at this juncture, the Court finds Plaintiffs' allegations of economic injury confer standing to pursue their § 2(c) claim.

2. *The physicians owe a fiduciary duty that § 2(c) was intended to address*

■ As noted above, the Ninth Circuit expanded § 2(c) to encompass only claims where bribery corrupts the fiduciary relationship between a buyer and its agent involving the sale or purchase of goods. *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851, 858 (9th Cir.1965). In their motion to dismiss, Defendants construe *Rangen* to apply only to a fiduciary duty in a commercial sense, not a medical one. The Defendants further argue that a physician only owes the latter, thus § 2(c) does not apply to this case.

The Defendants read *Rangen* too narrowly. In *Rangen,* the bribed official—Grimes—was "the superintendent of the state's fish hatchery at hagerman, [sic] Idaho ... [with] the authority in the Department with respect to the safe utilization and nutritional value of fish foods and with respect to fish food formulae." *Id.* at 854. Grimes did not have the responsibility for purchasing the goods. Instead, the court found "that Grimes did **influence** the responsible officials of the state to purchase substantially all of its fresh food requirements from the [bribing entity]." *Id.*

In short, Grimes was not a purchasing agent, but a scientist. A scientist whose responsibilities included ensuring that the state's fish hatcheries received fish food with adequate nutrition. In fact, Grimes' defense to the bribery charge consisted of the scientific explanation that he was merely conducting scientific experiments in exchange for the monies paid. *Id.* at 855. Yet, the Ninth Circuit still held that Grimes owed a fiduciary duty whose violation rose to § 2(c) liability.

The Court finds that this analysis applies to the doctors who accepted bribes. Like Grimes, the doctors were not purchasing

agents *per se* for the patients who utilized the Defendants. Yet, like Grimes, they were professional experts whose advice would exert great influence on the "buyers'" decision. Moreover, unlike Grimes, buyers in this case—the patients—probably had no knowledge of other sellers whereas the purchasing agents for Idaho's Department of Fish and Game most certainly knew of other fish food sellers. Considering the patients lack of information, therefore, the physicians' advice certainly exerted more influence than that exerted by Grimes. Accordingly, following *Rangen*, the Court finds that the physicians owe a fiduciary duty that § 2(c) was intended to address.[22]

### 3. The "services provided" exception does not apply when the Plaintiffs plead that no services were furnished

 Defendants' final attempt to dismiss Plaintiffs' § 2(c) claim hinges on the "services rendered" exception in the provision.[23] In pleading their § 2(c) claim, however, Plaintiffs clearly state that: "such commissions or other compensation were not paid for services rendered by doctors to their patients in connection with the sale or purchase of goods, wares, or merchandise." *See* Plaintiffs' Complaint at ¶ 40. Accepting this fact as true, the "services rendered exception" does not apply.[24]

### VI. Defendants' arguments concerning the Plaintiffs' pendent claim lack merit

Plaintiffs' fourth claim asserts that Defendants' business practices violated the California Business and Professions Code § 17200 *et seq.* The statute concerns the prevention of unfair business practices. *See* Cal. Bus. & Prof. § 17203. In the motion to dismiss, Defendants proffer three arguments why this claim should be dismissed: (1) any injunction Plaintiffs seek is unnecessary under California law; (2) Plaintiffs lack the standing necessary to assert a claim in federal court; and (3) the relief sought in this claim violated the Commerce Clause of the United States.[25]

---

**22.** Defendants reliance on *Harris v. Duty Free Shoppers Limited Partnership*, 940 F.2d 1272 (1991) to establish the contrary is misplaced. In *Harris*, the "intermediary" between the buyer and the seller—the tour bus—did not have any particular expertise that would convince the tourists that they should buy from the Defendant. *Id.* at 1275 (relying on the fact that "the tour guides [we]re not shopping 'experts'"). Here, however, the doctors are clearly experts of the goods they sold.

Moreover, the *Harris* court also relied on the fact that "the tourists are free to purchase their souvenirs and gift items anywhere; in fact, they are free not to purchase at all." *Id.* That is not the case here. Patients with such diseases as AIDS and cancer that require alternate site infusion therapies are not "free not to purchase," nor can they purchase anywhere if they are not informed of other providers. Unlike a duty-free store, one does not just come across an alternative site infusion therapy store. For these reasons, the Court finds *Harris* inapposite.

**23.** § 2(c) in its entirety states:

(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, *except for services rendered* in connection with the sale or purchase of goods, wares, merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c) (emphasis added).

**24.** At the hearing for this motion, Plaintiffs seemed to concede that the doctors performed some services in exchange for Defendants' payments. Nevertheless, Plaintiffs allege that the payments were far above fair market value for the services performed. The latter allegation alone would seem to make the "services rendered" exception as defined by the Ninth Circuit inapplicable: "a price allowance or discount to compensate for the **reasonable** value of such services would come within the exception of section 2(c) and would not be unlawful." *Federal Trade Commission v. Washington Fish & Oyster Co.*, 282 F.2d 595, 599 (9th Cir.1960).

**25.** The Court notes that Defendants do not claim that Plaintiffs have not stated a substantive claim under the statute. Instead, they argue standing, lack of necessity, and constitutional infirmities. The Court concurs in Defendants' decision finding that bribery, mail fraud and antitrust violations, if true, would constitute an unfair business practice. *See People v. McKale*, 25 Cal.3d 626, 159 Cal.Rptr. 811, 602 P.2d 731 (1979) (holding that statute applies to wrongful business conduct in whatever context.)

### 1. *Injunction Unnecessary*

██ The only relevant statute to this action is Cal. Bus. & Prof.Code § 17203.[26] Its "remedies are strictly limited to injunctive relief and restitution, which may include disgorgement of illicit profits to injured parties." *MAI Systems Corp. v. UIPS*, 856 F.Supp. 538 (N.D.Cal.1994); *see also People v. Thomas Shelton Powers, M.D., Inc.*, 2 Cal.App.4th 330, 340, 3 Cal.Rptr.2d 34 (1992). In its opposition, Plaintiffs do not argue that they are entitled to injunctive relief,[27] instead they argue that they are entitled to restitution.

In their reply, Defendants argue that restitution should not be granted because it was not pled in the complaint. This argument is erroneous: "plaintiffs pray for judgment as follows: ... (5) ... restitution of defendants' ill-gotten gains from the acts complained herein." See Plaintiffs' Complaint at pg. 22. Accordingly, the Court finds that the Plaintiffs have pled a cause of action for restitution under California Business and Professions Code.[28]

### 2. *Defendants' constitutional challenges to the pendent claim lack merit*

██ The Defendants put forward two constitutional arguments that supposedly merit dismissing the California claim: (1) Plaintiffs lack Article III standing; (2) a nationwide injunction would violate the Commerce Cause of the United States Constitution.

With regard to the latter argument, the Plaintiffs' failure to state a claim for injunctive relief necessarily moots the constitutionality of a nationwide injunction based on state law.

Plaintiffs also clearly have standing. To have standing, Plaintiffs must prove: (1) "injury in fact;" (2) "a causal relationship between the injury and the challenged conduct;" and (3) "a likelihood that the injury will be redressed by a favorable decision." *Northeastern Florida Contractors v. Jacksonville*, 508 U.S. 656, 664–65, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993). As stated, Plaintiffs have adequately pled that Defendants' behavior inflicted economic harm on the Plaintiffs. Plaintiffs also fulfill the causal requirement because if Defendants did not bribe physicians, its competitors would have obtained more clients. Finally, if Plaintiffs obtain restitution under the statute, their economic injury will be redressed. Accordingly, the Court finds that the Plaintiffs have standing.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss concerning Plaintiffs' § 1962(a) claim and Plaintiffs' mail and wire fraud claims but gives Plaintiffs 30 days leave to amend their complaint. The Court DENIES the remainder of Defendants' Motion to Dismiss.

IT IS SO ORDERED.

---

**26.** Cal. Bus. & Prof. Code § 17203 states as follows:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

**27.** Even if Plaintiff did pursue the argument, clearly the Defendants withdrawal from the business obviates the need for an injunction. *See Donald v. Cafe Royale, Inc.*, 218 Cal.App.3d 168, 184, 266 Cal.Rptr. 804 (finding that injunction unnecessary when Defendants no longer in business).

**28.** The Court does not interpret Plaintiffs' claim under this provision as one for damages, but rather for disgorgement of Defendants' profits. *See People v. Powers*, 2 Cal.App.4th 330, 340, 3 Cal.Rptr.2d 34 (1992) ("although there are few cases which have examined the remedies sanctioned by section 17203, there is little question but that the broad range of remedies provided for therein includes restitution and/or disgorgement of profits.")