107 F.3d 30
 RICO Bus.Disp.Guide 9213
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
LITTON SYSTEMS, INC., Plaintiff/Cross-Appellant,
v.
SSANGYONG CEMENT INDUSTRIAL CO., LTD., and Ssangyong Corp.,
Defendants-Appellants,
and
M-SQUARE MICROTEK, INC., Defendant/Cross-Appellee
and
Rubin K. LEE, Defendant/Cross-Appellee
and
Paul LAUNDERVILLE, Defendant.
 Nos. 96-1034, 96-1047.
 United States Court of Appeals, Federal Circuit.
 Feb. 13, 1997.
 
 Before MAYER, SCHALL and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 Ssangyong Cement Industrial Co., Ltd., and Ssangyong Corp. (collectively "SSY") appeal the judgment of the United States District Court for the Northern District of California holding SSY liable for unfair competition under section 44 of the Lanham Act, 15 U.S.C. § 1126, and awarding Litton Systems, Inc., damages in the amount of $65,728,129.44. That sum represents recovery for unjust enrichment ($27,496,000), prejudgment interest ($34,785,000), attorneys' fees and costs ($3,447,128.44), and punitive damages ($1). On SSY's appeal from the judgment, we vacate and remand for further proceedings.
 
 
 2
 Litton conditionally cross-appeals from the district court's dismissal of its claims against SSY and M-Square Microtek, Inc. ("M-Square") under the Racketeer Influenced and Corrupt Organizations ("RICO") statute and from the court's finding that Litton failed to prove compensable RICO damages with respect to its RICO claims against defendant Rubin K. Lee. Litton also conditionally appeals the district court's award of damages against SSY, and it conditionally appeals the district court's dismissal of all of the pendent state law claims. On Litton's cross-appeal, we affirm-in-part, reverse-in-part, and remand for further proceedings.
 
 
 3
 * The crux of Litton's claim is that M-Square misappropriated Litton trade secrets and documents relating to radar and microwave technology, and that it arranged to transfer that technology to SSY in Korea. Litton commenced the district court action on October 25, 1989, against SSY (including its U.S. subsidiary, Ssangyong U.S.A., Inc.), M-Square, and two of M-Square's officers (and former Litton employees), defendants Rubin Lee and Paul Launderville. In its complaint, Litton asserted patent infringement, unfair competition based on the Lanham Act, violations of the RICO statute, and various state law claims--misappropriation of trade secrets, unfair competition, interference with contractual relations, fraud, and breach of an employment contract (by defendant Lee).
 
 
 4
 On December 4, 1989, Litton sought expedited discovery, alleging that M-Square had transferred to SSY, or was in the process of transferring, Litton technology that is used to build radar tubes and power supplies for military applications. The district court ordered SSY's counsel to conduct an investigation and advise Litton whether M-Square had been or was transferring Litton technology to SSY in Korea.
 
 
 5
 Later that month, SSY responded in a letter stating that no such transfer of technology had been or was being made. SSY's letter also stated that, although SSY and M-Square had engaged in licensing negotiations for the manufacture of microwave products in Korea, "no such agreement has been signed and, as a result, no technology has been transferred thereunder." The district court then denied Litton's motion for expedited discovery and entered a stay of discovery to permit the defendants to file motions to dismiss.
 
 
 6
 After the motions to dismiss were filed and briefed, the district court dismissed the federal unfair competition claim against all defendants other than SSY, dismissed the patent infringement claim and all the RICO claims against SSY, and dismissed several of the RICO claims against the other defendants. Declining to exercise pendent jurisdiction, the court dismissed the state law claims against all of the defendants as well.
 
 
 7
 Several months later, Litton filed a motion for sanctions, alleging that M-Square and Lee had destroyed evidence. The district court appointed a special master to conduct a hearing on "whether any parties to this litigation have destroyed documents or other evidence relevant to this litigation with actual or constructive knowledge that such destruction constituted spoliation of evidence." Following an evidentiary hearing, the special master concluded that Lee had taken Litton documents with him when he established M-Square and that he had destroyed those documents both before and after Litton's action was filed. The special master, however, found no evidence that SSY had destroyed documents or otherwise engaged in spoliation of evidence.
 
 
 8
 The district court adopted the factual findings of the special master but reserved judgment on the sanctions to be imposed until after further discovery was conducted regarding the relationship between M-Square and SSY. The court ordered a hearing to be held in April 1992 on that relationship "and the appropriate sanctions to be imposed on defendants." Litton proceeded with its discovery, from which it learned that in 1987 the chairman of SSY had directed a representative to meet with Lee while Lee was still employed at Litton. The meetings between SSY's representative and Lee had resulted in the preparation of an M-Square business plan that proposed an SSY investment in M-Square. Litton also obtained evidence that during the discovery stay ordered by the district court, Kim Jae-Hoo, a high-ranking officer of SSY, had destroyed a personal file that Litton contended was within the scope of a prior discovery request.
 
 
 9
 On March 29, 1992, Litton submitted a brief seeking sanctions against SSY not only for M-Square's conduct, but also for SSY's own misconduct, including its misleading December 1989 letter and the destruction of Kim's personal file during the discovery stay. On April 14, 1992, the court heard arguments on the sanctions issue and ruled from the bench. With respect to SSY's own conduct, the court stated:
 
 
 10
 It appears, notwithstanding the assertions made on Ssangyong's behalf by Mr. Mescon, that Ssangyong and its personnel were not mere bystanders to the misdeeds which have brought us to today's hearing. Mr. Kim Jae Hoo, the court determines, was aware of the lawsuit in December 1989 and yet destroyed requested files months later, in June 1990. Although Ssangyong denied receiving any technology from M-Square, that denial was contained in a December 1989 letter and denied signing a licensing agreement. [sic] In fact, Rubin Lee was helping a Doctor Yang to make the technology which is here in issue in June 1988. And there is correspondence which refers to the specifications of this technology which Lee admitted taking from Litton. [The existence of a] licensing agreement [between SSY and M-Square] was denied in a December 1989 letter, and apparently in a hearing a month later, as Mr. Lorig corrected. But in fact that licensing agreement had already been signed and was in existence as early as July 1989. It was during the stay of discovery ordered by Judge Schwarzer, to whom this case was previously assigned, that Mr. Kim Jae Hoo destroyed the files that have been the subject of much discussion in this case.
 
 
 11
 The district court further held that SSY was liable for the actions of M-Square because it was an "alter-ego" of M-Square based on SSY's control of M-Square and M-Square's undercapitalization. The court then imposed the sanction of default against SSY based on SSY's own actions and those of M-Square for which the court held SSY responsible. SSY filed a motion for reconsideration, requesting an evidentiary hearing on the sanctions issue and arguing that SSY was not on notice of "the focus of the court's inquiry" and therefore lacked "adequate notice of the issues upon which the Court ultimately based its decision." The court denied the motion, stating that "the Ssangyong defendants were on notice that the issue before the court on April 14 was their own default" and that the court did not "find a triable issue of material fact on the questions of Ssangyong's control of M-Square and M-Square's status as the alter-ego of Ssangyong."
 
 
 12
 The district court subsequently held a hearing limited to the issue of damages and disposed of most of the remaining issues in the case in an opinion dated September 28, 1994. First, the district court held that its alter-ego conclusion resurrected the previously dismissed patent infringement claim against SSY and required the dismissal of all of the remaining RICO claims against M-Square and one of the RICO claims against Lee. With respect to the substantive RICO claim under section 1962(c), the court held that "liability can only be visited upon the 'person' who controls the 'enterprise,' " and "the 'enterprise' itself cannot violate § 1962(c)." Because the court treated SSY and M-Square as both the "person" and the "enterprise" referred to in the statute, it held that the section 1962(c) claim could not stand. With respect to the RICO conspiracy claim under 18 U.S.C. § 1962(d), the court held that because M-Square could not commit a substantive RICO violation, it could not commit a RICO conspiracy violation, and that the conspiracy claims against both M-Square and Lee therefore had to be dismissed.
 
 
 13
 Turning to the issue of damages under the federal unfair competition claim, the district court looked to the remedy provisions of the California Uniform Trade Secrets Act and concluded that Litton had established unjust enrichment within the meaning of that Act. The court ruled that "instead of basing the damage award on the actual gain the thieves achieved as a result of the theft, the court could base the award on the gain the defendants expected to attain as of the time of the theft" (emphasis in original). The court adopted a "deterrence-based approach" to calculating damages, based on the "present-valued profit stream anticipated at the time of theft." Using a 1989 SSY business plan to arrive at the expected stream of income, the court concluded that SSY was chargeable with unjust enrichment in the amount of $27,496,000. The court subsequently awarded prejudgment interest, attorneys' fees, and costs to Litton on the federal unfair competition claim against SSY.
 
 
 14
 With regard to the remaining RICO claims against Lee, the court held that Litton had failed to prove recoverable damages. The court noted that damages under the RICO statute must reflect actual loss to the plaintiff, not unjust enrichment of the defendant. Addressing Litton's proof of damages, the court held that Litton had failed to prove that Lee's alleged RICO violations caused any loss to Litton of the kind for which the RICO statute authorizes recovery. With respect to the patent infringement claim, the court also held that Litton had failed to prove recoverable damages resulting from the alleged acts of infringement. Thus, the only claim that survived to support the imposition of liability on final judgment was the federal unfair competition claim against SSY.
 
 II
 
 15
 SSY attacks the district court's decision on several grounds. Its principal contentions are that: (A) the district court lacked subject matter jurisdiction over the so-called "federal unfair competition" claim; (B) the entry of default against SSY was improper; and (C) because the district court erroneously based its finding of unjust enrichment on SSY's expected gain from the theft of trade secrets, the entire judgment in Litton's favor must be vacated.
 
 
 16
 * The district court's jurisdiction over the federal unfair competition claim arises from the combination of section 44 of the Lanham Act and Article X of the Treaty of Friendship, Commerce and Navigation between the United States and the Republic of Korea. Section 44(b) of the Lanham Act provides that any citizen of a foreign nation with which the U.S. has a treaty relating to the repression of unfair competition is eligible for the benefits accorded by section 44 "to the extent necessary to give effect to any provision" of such a treaty. 15 U.S.C. § 1126(b). Section 44(h) provides that persons designated in section 44(b) are entitled to "effective protection against unfair competition" and makes available the remedies provided under the Act for trademark infringement "so far as they may be appropriate in repressing acts of unfair competition." 15 U.S.C. § 1126(h). Section 44(i) grants U.S. citizens the same rights that are conferred by section 44 to the persons described in subsection (h). 15 U.S.C. § 1126(i). Article X of the Treaty of Friendship ensures "[n]ationals and companies" of either party "national treatment" with respect to patents, trademarks, "and industrial property of every kind."
 
 
 17
 The district court interpreted section 44 and the Korean Friendship Treaty to create a federal cause of action for unfair competition. Thus, the court held that Litton, a U.S. company, enjoyed a federal right to sue SSY, a foreign company of a signatory country, for an act of unfair competition. The court further held that Litton was entitled to invoke state law rights and remedies in pursuing that federal cause of action in federal court. SSY challenges that interpretation of the statute, but its claim is foreclosed by governing Ninth Circuit law, which controls our disposition of this non-patent issue, see Atari Games Corp. v. Nintendo of Am., Inc., 897 F.2d 1572, 1575 (Fed.Cir.1990).
 
 
 18
 In Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788 (9th Cir.1981), the Ninth Circuit set forth its interpretation of the relationship between the Lanham Act and a friendship treaty similar to the Korean treaty at issue in this case. The court held that subsections (b) and (h) of section 44 "work together to provide federal rights and remedies implementing federal unfair competition treaties," and that because domestic companies are entitled to the protection of applicable state unfair competition laws, foreign companies are also "entitled to the protection accorded by any applicable state law of unfair competition." 645 F.2d at 792-93. The effect of that analysis, the court concluded, is that section 44 and the friendship treaty provide the foreign company "a federal forum in which [to] pursue its state claims." Id. at 793. Thus, in this instance, the court explained, federal law "incorporates state law." Id. at 794. And because a foreign company may invoke state law in pursuing its federal cause of action, section 44(i) affords the same right to a domestic company or individual that brings suit against such a foreign company.
 
 
 19
 SSY attempts to distinguish Toho by noting that in Toho the district court had jurisdiction under section 43(a) of the Lanham Act and that the state law claims were before the court through pendent jurisdiction. That effort to explain Toho, however, does not square with what the court did. The Toho court held that section 44 of the Lanham Act, in conjunction with the treaties referred to in section 44(b), created a separate federal cause of action that incorporated applicable state law rights and remedies. As the court explained, it was not pendent jurisdiction that gave Toho "a federal forum in which [to] pursue its state claims," but the combination of the friendship treaty and section 44 of the Lanham Act. 645 F.2d at 793. Toho therefore directly supports the district court's reliance on section 44 as providing a basis for federal jurisdiction in this case. Moreover, there is no force to SSY's argument that section 44 exceeds Congress's powers because it is a naked jurisdiction-granting statute that simply opens the federal courts to actions to enforce state-law rights. As construed by the court in Toho, section 44 creates a federal cause of action that incorporates state law rights and remedies in addition to the remedies of the Lanham Act as appropriate to repress acts of unfair competition. In addition, section 44 requires the court to apply the provisions of a treaty in determining whether a plaintiff is eligible to proceed under section 44--a distinctly federal question. Viewed in that manner, an action under section 44 arises under federal law within the meaning of Article III of the Constitution, and is not beyond the power of Congress to create. See Verlinden B.V. v. Central Bank, 461 U.S. 480, 493 (1983).
 
 B
 
 20
 The district court entered a default against SSY on the basis of SSY's own conduct and the conduct of M-Square that the court held attributable to SSY. SSY argues that the court committed clear error in its rulings on both issues. In addition, SSY argues that the court adopted Litton's position without providing SSY adequate notice and without conducting a hearing on disputed questions of material fact. We agree that the procedure followed by the district court was flawed and that this case must be remanded for that reason. In light of the need for further proceedings on the issue of default, we do not address SSY's contention that the district court's default order was based on clearly erroneous determinations of fact.
 
 
 21
 When Litton raised the question of evidence destruction by M-Square and its president, Lee, the special master held an evidentiary hearing and concluded that M-Square and Lee had conducted acts of evidence spoliation. The special master found, however, that there was no evidence that SSY engaged in any sanctionable conduct. The district court then ordered further discovery on the relationship between SSY and M-Square and scheduled a hearing to determine whether sanctions should be imposed against SSY based on "Ssangyong's responsibility for M-Square's prior acts." During that discovery, Litton uncovered additional facts bearing on SSY's relationship with M-Square as well as facts relating to the separate conduct of SSY officers and representatives that ultimately formed the basis for the court's ruling against SSY on the default issue. Nonetheless, in a telephonic conference shortly before the scheduled sanctions hearing, the court again confirmed the understanding of SSY's counsel that the subject matter of the hearing would be "the question about whether or not sanctions should be imposed on the Ssangyong defendants for the conduct found by the special master to have been engaged in by M-Square."
 
 
 22
 Although Litton's pre-hearing brief referred to SSY's own conduct in the course of arguing that SSY be held responsible for M-Square's conduct, the district court did not indicate that the scope of the April 14, 1992, hearing would be expanded to address the questions of SSY's conduct that arose during discovery. Nonetheless, at the hearing (where no evidence was received), the court ruled from the bench on the sanctions issue and based its ruling of default against SSY on both SSY's own conduct and the conduct of M-Square, for which the court found SSY legally responsible.
 
 
 23
 In concluding that SSY should be sanctioned for its own conduct, the district court found: (1) that Kim Jae-Hoo was aware of Litton's lawsuit in December 1989, "yet destroyed requested files months later"; (2) that Lee had helped Dr. Yang of SSY "to make the technology" at issue; and (3) that SSY's December 1989 letter had represented that the parties had not signed a licensing agreement, when in fact such an agreement had been signed. With respect to SSY's responsibility for M-Square's conduct, the court held that M-Square should be regarded as an alter-ego of SSY on the grounds that SSY had de facto control of M-Square, and that M-Square was undercapitalized.
 
 
 24
 Before the district court, the parties sharply disagreed about the facts relating to the issues of SSY's alleged misconduct and SSY's relationship to M-Square. Nonetheless, the district court decided both issues against SSY without an evidentiary hearing, and solely on the basis of evidence developed during discovery. The issues bearing on the propriety of the default sanction were highly factual. With respect to SSY's own conduct, the court had to determine not only what SSY's representatives did, but whether they acted with the requisite state of mind, see Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir.1983), a question not resolved by the discovery disclosures. With respect to the district court's finding that M-Square was SSY's "alter-ego," there were likewise disputed questions of fact going to the extent of SSY's actual control of M-Square and M-Square's asserted undercapitalization. The determination of whether to disregard the corporate entity in order to impose liability is a fact-intensive inquiry, see Seymour v. Hull & Moreland Eng'g, Inc., 605 F.2d 1105, 1111 (9th Cir.1979); Mid-Century Ins. Co. v. Gardner, 11 Cal.Rptr.2d 918, 922-23 (Cal.Ct.App.1992), and it was improper for the district court to resolve disputed issues of fact material to that inquiry on what amounted to a summary judgment. See Local 343, United Ass'n of Journeymen v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1475 (9th Cir.), cert. denied, 116 S.Ct. 297 (1995)(reversing grant of summary judgment on the veil-piercing claim).
 
 
 25
 Moreover, because the district court had on several occasions stated that the purpose of the April 14 hearing was to explore whether SSY should be held liable for the misconduct of M-Square, the court's decision to address and resolve the question of SSY's culpability for the conduct of its own officers and representatives denied SSY fair notice of the purpose of the hearing and an opportunity to meet Litton's allegations on that issue. Accordingly, because we conclude that the district court resolved the two principal disputed issues in this case without an adequate hearing, its entry of a default against SSY on the basis of SSY's own conduct and the conduct attributable to SSY through M-Square must be vacated.
 
 
 26
 On remand, the court must hold an evidentiary hearing (or resubmit the matter to a special master) to resolve the disputed issues of fact on which the default question turns. After resolving those factual questions, the court should apply the standards announced by the Ninth Circuit in cases such as Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 348 (9th Cir.1995), to determine whether SSY should be subject to sanctions based on its own conduct or, if appropriate, the conduct of M-Square, and whether, if such sanctionable conduct is found, the entry of a default is appropriate.
 
 C
 
 27
 Because we vacate the sanction of default entered against SSY, we necessarily vacate the award of damages against SSY, as well as the award of interest, attorneys' fees, and costs. Since the district court may reach the damages issue again on remand, however, we think it appropriate to address the district court's method of calculating damages based on its definition of unjust enrichment as the "present-valued profit stream anticipated at the time of theft."
 
 
 28
 As noted above, section 44 of the Lanham Act and the provisions of the Korean friendship treaty cooperate to create a federal cause of action for unfair competition with respect to parties such as SSY and Litton. The remedial section of the Lanham Act provides that a prevailing plaintiff may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The Ninth Circuit in Toho further held that the district court in an action arising under section 44(h) could invoke the remedial provisions of the applicable state law. In this case, the district court therefore properly looked not only to the Lanham Act, but also to California state law, and in particular the California Uniform Trade Secrets Act (UTSA), to select a remedy.
 
 
 29
 The California UTSA provides, in pertinent part:
 
 
 30
 (a) A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.
 
 
 31
 If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.
 
 
 32
 Cal. Civ.Code § 3426.3.
 
 
 33
 The correct approach under California law is to evaluate the evidence of the plaintiff's actual loss and the defendant's unjust enrichment caused by the misappropriation. If the plaintiff has failed to produce sufficient proof on either score, the court may look to evidence of a reasonable royalty. Failure to produce evidence of actual loss, unjust enrichment, or a reasonable royalty results in the assessment of zero damages under California law. See Unilogic, Inc. v. Burroughs Corp., 12 Cal.Rptr.2d 741, 749-50 (Cal.Ct.App.1992) (even though liability was established, the court dismissed the trade secret misappropriation claim for lack of evidence of actual loss, unjust enrichment, or reasonable royalty). The district court in this case selected unjust enrichment as the measure of damages, because it concluded that "Litton would undoubtedly prefer" that approach since it would produce a higher award.
 
 
 34
 In cases of trade secret misappropriation, unjust enrichment is normally measured by the defendant's profits on sales attributable to the use of the trade secret. See Restatement of Unfair Competition § 45 cmt. f (1995); 1 Melvin F. Jager, Trade Secrets Law § 3.03[b][i] (1995). The defendant's gain has also been measured by the cost saving that the defendant has realized from using the trade secret. Id.; see also Salsbury Labs., Inc. v. Merieux Labs., Inc., 908 F.2d 706, 714 (11th Cir.1990). The district court's theory of unjust enrichment as encompassing unrealized expected gain, however, is unsupported in the law of unfair competition and cannot serve as a valid basis for an award of damages in this case.
 
 
 35
 Litton argues that the district court's award for unjust enrichment is defensible on the ground that in "relying on defendants' own business plans, the court awarded Litton far less than what would have otherwise been awarded." Specifically, Litton asserts that the district court selected SSY's expected gain as a measure of damages only after determining that SSY's saved development costs were greater than its expected gain, and that the court's adoption of the "expected gain" theory therefore did not prejudice SSY.
 
 
 36
 The parties dispute the state of the record with respect to the evidence regarding saved development costs, and we decline Litton's invitation to uphold the judgment in this case on the theory that the amount of the award was less than the district court could have granted under a different theory. The district court based its award on an erroneous principle of law, and we do not attempt to resolve the disputes among the parties regarding whether other, alternative damages theories could validly support a judgment in Litton's favor and how large such a judgment might be.
 
 III
 
 37
 In its conditional cross-appeal on the RICO and pendent claim issues, Litton urges that the district court's judgment be reversed on the following grounds: (A) the district court erred in dismissing the substantive RICO claim under 18 U.S.C. § 1962(c) against SSY and M-Square; (B) the district court erred in dismissing the RICO conspiracy claim under 18 U.S.C. § 1962(d) against SSY, M-Square, and Lee; (C) the district court erred in not awarding damages against the defendants based on the RICO claims; and (D) the district court erred in refusing to exercise pendent jurisdiction over Litton's state law claims.
 
 
 38
 * Early in the litigation, the district court dismissed the section 1962(c) claim (the third claim in the complaint) against SSY on the ground that "[s]ince an entity may not associate with itself, the Ssangyong defendants cannot be both defendants and part of the association in fact enterprise alleged." Two years after the district court's ruling, the Ninth Circuit clarified its earlier precedent and held that "some of the individual defendants may also be identified as members of the alleged association-in-fact enterprise." River City Mkts., Inc. v. Fleming Foods West, Inc., 960 F.2d 1458, 1461 (9th Cir.1992). In light of that decision, SSY could properly be part of the association-in-fact enterprise as well as a RICO defendant. Because the district court properly held that Litton sufficiently pleaded the non-fraud based predicate acts, we reject SSY's argument to the contrary. We therefore reverse the district court's dismissal of the section 1962(c) claim in the complaint against SSY. The district court's dismissal of the same claim against M-Square likewise must be reversed because, as a member of the association that was alleged as the enterprise, M-Square was eligible to be charged as a defendant as well. Moreover, contrary to the district court's conclusion, the finding (which we have vacated) that M-Square was an "alter ego" of SSY did not render M-Square immune from any of the RICO charges. As a separate legal entity, M-Square was subject to legal liability for misconduct committed by its agents on its behalf, even if M-Square was dominated and controlled by SSY.
 
 B
 
 39
 In its October 1990 order, the district court dismissed the fourth claim of the complaint, a RICO conspiracy claim, against SSY for pleading inadequacies. The court explained that "[a]llegations of control, agency, and ratification are conclusory legal allegations, and do not inform the Ssangyong defendants of the specific acts they committed in joining the conspiracy." The court subsequently dismissed the same claim against M-Square and Lee on the ground that the court's alter-ego finding rendered M-Square part of the enterprise and left Lee as the sole conspirator and thus ineligible to be charged with conspiracy.
 
 
 40
 In its amended complaint, Litton did more than simply allege that Lee and M-Square acted as SSY's agents. Paragraphs 88 through 93 of the complaint, in combination with the incorporated subject matter, allege that SSY joined a conspiracy with Lee to participate in the affairs of M-Square and that SSY committed acts of commercial bribery and interstate transportation of stolen property. Litton's amended complaint satisfies the notice pleading standards of the Federal Rules of Civil Procedure. Moreover, the court's alter-ego finding, which we have vacated, does not change the posture of M-Square or Lee with respect to the RICO conspiracy charge in Litton's fourth claim. Accordingly, we reverse the district court's dismissal of the fourth claim of Litton's complaint as to SSY, M-Square, and Lee.
 
 C
 
 41
 On the issue of RICO damages, Litton faces more serious difficulties. The RICO statute authorizes suit only by a person who is "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The Ninth Circuit has interpreted that language to require a RICO plaintiff to prove a "concrete financial loss." Pillsbury, Madison & Sutro v. Lerner, 31 F.3d 924, 929 (9th Cir.1994); see also Steele v. Hospital Corp. of Am., 36 F.3d 69, 70 (9th Cir.1994); Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1310 (9th Cir.1992); Oscar v. University Students Co-op Ass'n, 965 F.2d 783, 785-86 (9th Cir.1992) (en banc). Injury to "a valuable intangible property interest" is not sufficient to satisfy that test. Berg v. First State Ins. Co., 915 F.2d 460, 464 (9th Cir.1990). Moreover, the plaintiff must prove that the RICO violation was the proximate cause of the asserted loss. Holmes v. Securities Inv. Protection Corp., 503 U.S. 258, 268 (1992).
 
 
 42
 In ruling in favor of Lee on the RICO claims, the district court held that Litton failed to prove a qualifying RICO injury. Litton contends that it suffered an actual loss as a result of Lee's RICO violation and that its loss is cognizable under the RICO statute. In particular, Litton contends that the "actual loss" occasioned by the theft of its trade secrets can be measured by the amount of the licensing fee that SSY would have had to pay to obtain those trade secrets legitimately. That hypothetical licensing fee, however, does not constitute a "concrete financial loss" within the meaning of the RICO statute as construed by the Ninth Circuit. See Imagineering, 976 F.2d at 1310-11. A hypothetical licensing fee may provide some measure of the value of Litton's property, but it does not reflect an actual loss suffered by Litton as a result of the alleged theft of its trade secrets. Because Litton failed to show that Lee's RICO violations caused Litton concrete financial loss, we affirm the ruling of the district court on the damages issue.
 
 
 43
 Because the district court dismissed Litton's RICO claims against SSY and M-Square on other grounds, Litton has not been afforded the opportunity to litigate the issue of whether it suffered any qualifying RICO injury as a result of the conduct of SSY and M-Square. In view of the district court's treatment of the issue of RICO injury, which we affirm with respect to defendant Lee, it may be that Litton will be unable to satisfy its burden on that issue with respect to SSY and M-Square. Nonetheless, Litton is entitled to present its RICO claims on remand with respect to SSY and M-Square, even though it will be subject to the same proof requirements as to the issue of injury that the district court imposed with respect to defendant Lee.
 
 D
 
 44
 Litton has requested that this court review the district court's refusal to exercise pendent jurisdiction over Litton's state law claims "only if the court overrules Toho " and holds that Litton may not proceed under section 44 of the Lanham Act. We have not "overruled" Toho, which we would not have the power to do in any event. In fact, we have followed Toho as binding Ninth Circuit law, and we have remanded Litton's section 44 claim to the district court for further proceedings under the interpretation of Toho advanced by Litton. Accordingly, following the conditions that Litton placed on its conditional cross-appeal from the portion of the district court's judgment dismissing the pendent state claims, we find it unnecessary to address the question of whether the district court erred when it declined to exercise pendent jurisdiction over the state law claims in the amended complaint.
 
 
 45
 Each party shall bear its own costs for this appeal.